**PRECEDENTIAL**


UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-2925
_____


SANTHAKUMAR SATHANTHRASA,
Petitioner

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA
_____

On Petition for Review
from the Board of Immigration Appeals
(BIA No. A209-240-315)
Immigration Judge: Walter A. Durling
_____

Argued January 14, 2020


Before: JORDAN, GREENAWAY, JR., and KRAUSE,
*Circuit Judges*


(Opinion filed: July 30, 2020)

Visuvanathan Rudrakumaran          [**Argued**]
875 Avenue of the Americas
Suite 906
New York, NY 10001
    *Counsel for Petitioner*


Todd J. Cochran      [**Argued**]
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC 20044
    *Counsel for Respondent*

_____

## OPINION OF THE COURT

_____


KRAUSE, *Circuit Judge*.

To be eligible for withholding of removal, a noncitizen must show a clear probability of future persecution upon removal to her country of origin, so applicants granted withholding will necessarily have satisfied the lesser standard of a well-founded fear of persecution required for eligibility for asylum. But while withholding is mandatory if the statutory criteria are satisfied, the decision to grant asylum is ultimately left to the discretion of the Attorney General and, between the two forms of relief, only the latter provides a pathway to legal permanent resident status and a basis to petition for admission

of family members as derivative asylees.  So the immigration regulations provide that when a petitioner is denied asylum but then granted withholding, the denial of asylum "shall be reconsidered," and the factors the immigration judge (IJ) must consider "will include" not only the "reasons for the denial" but also "reasonable alternatives available" to the petitioner for family reunification.   8 C.F.R. § 1208.16(e); *accord id.* § 208.16(e).[1]

Here, Petitioner alleges that the IJ failed to consider those factors and therefore abused his discretion.  We agree and thus will grant the petition, vacate the order of the Board of Immigration Appeals (the BIA or the Board), and remand with instructions that the IJ properly reconsider the denial of asylum.

## I.     FACTUAL BACKGROUND[2]

Petitioner Santhakumar Sathanthrasa is a citizen of Sri Lanka, a country whose modern history has been marked by

---

[1]  8  C.F.R. §§ 208.16(e)  and  1208.16(e)  are  identical provisions, the latter of which applies to the BIA.  *See Huang v. INS*, 436 F.3d 89, 90 n.1 (2d Cir. 2006).  The parties used these provisions interchangeably throughout the briefing, but for  concision  and  consistency  we  will  refer  only  to § 1208.16(e).

[2] Sathanthrasa is entitled to "a rebuttable presumption of credibility on appeal," 8 U.S.C. § 1158(b)(1)(B)(iii), because although the IJ indicated that he was not "overly enamored

civil unrest and violence among the Sinhalese, Moor, and Tamil populations. *See Mohideen v. Gonzales*, 416 F.3d 567, 568 (7th Cir. 2005). Sathanthrasa is Tamil and seeks asylum based on the violence that ethnic minority group has faced at the hands of not only government forces, but also the Karuna Group (otherwise known as the People's Liberation Tigers). The Karuna Group is a paramilitary organization led by a former commander of the Liberation Tigers of Tamil Eelam (LTTE), "a terrorist organization based in northern Sri Lanka" that waged a more-than-thirty-year-long "violent campaign to create an independent state for Sri Lanka's Tamil minority." *Krishnapillai v. Holder*, 563 F.3d 606, 609 (7th Cir. 2009). After the Karuna Group splintered from the LTTE movement, its members began working with the Sri Lankan Government to target Tamil men and women who were suspected LTTE members, Sathanthrasa among them.

Sathanthrasa's troubles began in 2007 when his three brothers were kidnapped by "unknown people." JA 89, 108, 114. One of his brothers was taken from a bus by "Navy Officers"; another was kidnapped at gunpoint by "unidentified persons" in front of his family; and the third was kidnapped by "some persons in a white van."[3] JA 145. After two years

with the respondent's testimony," JA 75, he declined to make an adverse credibility determination.

[3] Peaking in the late 2000s and continuing through most of the next decade, abductions of Tamils and political dissidents by individuals in white vans became such a widespread practice in Sri Lanka that victims were said to be "white vanned," and the culture of violence became known as a "white van culture." JA 383–84; *see also* Brief of Professors of Sri

4

passed without word from his siblings, Sathanthrasa reported the kidnappings to the Human Rights Commission. He did not ascribe blame to the Karuna Group, reporting only that his brothers were kidnapped by "unknown people." JA 113. Nonetheless, he faced swift retribution.

One day when he was unloading cargo from a tractor, members of the Karuna Group forcibly dragged him into a white van and took him to a camp run by the Karuna Group. In the van and at the camp he was beaten, berated for reporting the kidnappings, and asked repeatedly whether he had received training from the LTTE, which he denied. His abductors "twisted [his] arm, . . . hit [him], and kicked [him] with their boots on [his] chest." JA 116. They eventually "pointed a small gun" at him and told him "to run away without turning and looking back." JA 115. Fearing he would be shot, Sathanthrasa ran, first to a nearby church, then to his workplace, and next to a hospital, before finally seeking shelter in his father's house. The hospital diagnosed him with "internal injur[ies]" from the beatings, and he was later treated by an indigenous doctor. JA 116.

Several days after Sathanthrasa fled the camp, individuals in green uniforms, who Sathanthrasa alleged were members of either the Karuna Group or the army, came to his father's house looking for him. Sathanthrasa saw them approach and managed to escape out of the back of the house. His father was not so lucky. He was beaten after being interrogated about

Lankan Politics as Amici Curiae in Support of Respondent at 8–9, *DHS v. Thuraissigiam*, No. 19-161 (U.S. Jan. 22, 2020), 2020 WL 402612.

"where his son was" and responding that Sathanthrasa "had gone to work and . . . [would] not come back." JA 117–18. Eventually, the attackers left with the warning that once Sathanthrasa returned, he "should stay here without going anywhere, and [they] will come back." JA 118.

Fearing for his safety, Sathanthrasa then fled to his uncle's house, but there, yet another incident occurred. Shortly after he arrived, armed members of Sri Lanka's Criminal Investigation Department (CID) picked him up and took him to a police station, where he was detained for two days and interrogated on suspicion of being affiliated with the LTTE. Once released, Sathanthrasa worried that if he stayed at his uncle's house he would "have [a] lot of trouble," so he went to live with his aunt. JA 119–20.

Over the next six years, kidnappings remained commonplace, and although Sathanthrasa did not suffer additional threats or attacks during that period, he continued to fear that he would suffer the same fate as his siblings. Nonetheless, he did not leave Sri Lanka before 2016 because, as he testified, he "did not have money" to do so before then, and "therefore [he] had to later on borrow some money" before he was able to leave. JA 129. When the IJ inquired about the source of the funds, Sathanthrasa testified that he "had some money, . . . pawned jewelry, . . . mortgaged some property, [and] borrowed money from [his] father's younger brother and [his] cousin." *Id.* In the interim, Sathanthrasa lived openly, renting a house with his wife and their two children and working for a painting company without incident.

## II.   PROCEDURAL HISTORY

Upon entering the United States, Sathanthrasa petitioned for asylum, withholding of removal, and protection under the Convention Against Torture (CAT).   In support of these claims, Sathanthrasa testified before the IJ concerning the abuses he experienced in Sri Lanka and his belief that if he returns to Sri Lanka he will be taken into custody and tortured "because [he] went and spoke bad about the country, and because [he] made a complaint about [his] missing siblings." JA 122.

The IJ was persuaded only in part.   Before issuing his oral ruling, the IJ indicated that although he planned on granting withholding of removal, he would deny asylum.   In response to the protest of Sathanthrasa's counsel that a denial of asylum would make it impossible for Sathanthrasa to reunite with his wife and children, the IJ responded that he was "not concerned about that" and that Sathanthrasa's counsel was "getting into areas that [he] d[id not] care about" and that "ha[d] nothing to do with [his] decision."   JA 138–39.   He then proceeded to announce his ruling.

On the one hand, the IJ granted Sathanthrasa's petition for withholding of removal based on the likelihood that Sathanthrasa would be "tortured or persecuted" as an LTTE sympathizer or a failed asylum seeker if he returned to Sri Lanka. JA 77–78. On the other hand, he denied Sathanthrasa's petition for asylum on the grounds that Sathanthrasa's abuse did not rise to the level of past persecution, that Sathanthrasa had waited "some seven years" after the last incident to flee to the United States, and that he was not in hiding during those intervening years.   JA 76–77.   Because the IJ granted

withholding, he declined to consider Sathanthrasa's application for CAT protection.

On Sathanthrasa's appeal of the denial of asylum, the BIA promptly reversed and remanded. Because asylum can be denied based on statutory ineligibility or as a matter of discretion and it was not clear which formed the basis for the IJ's ruling, the Board directed the IJ to clarify his reasoning. And in view of 8 C.F.R. § 1208.16(e)—which provides that a denial of asylum "shall be reconsidered" when "an applicant is denied asylum solely in the exercise of discretion . . . [and] is subsequently granted withholding of . . . removal under this section, thereby effectively precluding admission of the applicant's spouse or minor children following to join him or her"—the BIA was explicit that if the denial was discretionary, the IJ was required to reconsider his asylum ruling, taking into account the "reasons for the denial" and "reasonable alternatives available to the applicant such as reunification with the spouse or minor children in a third country." JA 45 (citing 8 C.F.R. § 1208.16(e)).

With the case returned to him, the IJ clarified that he was denying asylum as a matter of discretion. He identified two reasons for the denial: that Sathanthrasa's abuse at the hands of the Karuna Group did not rise to the level of past persecution because he had suffered only minor injuries when he was beaten and that Sathanthrasa must have had an "ulterior motive" for traveling to the United States because his explanation for the delay was "wholly unpersuasive." JA 38–39. Left unaddressed were the issues of family reunification and the significance of Sathanthrasa's well-founded fear of persecution, which the IJ had credited, for the discretionary denial of asylum. In a footnote, the IJ stated that he had "considered 8 C.F.R. § 208.16(e) in this regard." JA 39 n.2.

8

So Sathanthrasa again appealed. This time the BIA dismissed his petition, asserting that "the only positive factors [he had] identified were: (1) that his grant of withholding of removal was not as beneficial to him as asylum; and, (2) that Tamils have suffered a genocide." JA 8. By way of reasoning, the BIA stated only that the IJ "was aware of the situation and its implications" and that it was "declin[ing] to disturb the [IJ's] decision" because Sathanthrasa "ha[d] not identified error in the factors considered." *Id.* Sathanthrasa timely petitioned this Court for review.

### III.    JURISDICTION AND STANDARD OF REVIEW

The BIA had jurisdiction pursuant to 8 U.S.C. § 1103 and 8 C.F.R. § 1003.1(b), and we have jurisdiction pursuant to 8 U.S.C. § 1252(a). We review the IJ's decision "where the BIA has substantially relied on that opinion," *S.E.R.L. v. Att'y Gen.*, 894 F.3d 535, 543 (3d Cir. 2018) (quoting *Camara v. Att'y Gen.*, 580 F.3d 196, 201 (3d Cir. 2009)), and where the BIA has adopted the IJ's decision and conducted its own analysis, "we review both the IJ's and the BIA's decisions," *id.* (quoting *Ordonez-Tevalan v. Att'y Gen.*, 837 F.3d 331, 341 (3d Cir. 2016)).

We review a discretionary denial of asylum for abuse of discretion, *Huang v. Att'y Gen.*, 620 F.3d 372, 379 (3d Cir. 2010) (citing 8 U.S.C. § 1252(b)(4)(D)), and we will remand if the decision was "arbitrary, irrational, or contrary to law," *Tilija v. Att'y Gen.*, 930 F.3d 165, 170 (3d Cir. 2019) (citation omitted).

9

## IV.  DISCUSSION

Because the Government does not contest that Sathanthrasa established both a well-founded fear of future persecution and eligibility for withholding of removal, the sole issue before us is whether the IJ failed to properly reconsider his discretionary denial of asylum as mandated by 8 C.F.R. § 1208.16(e).[4]  To resolve this issue we address briefly the factors that guide a reconsideration of the discretionary denial of asylum under § 1208.16(e) before reviewing the decision of the IJ in this case.

### A.  Reconsideration of a discretionary denial of asylum

In full, § 1208.16(e) provides:

> In the event that an applicant is denied asylum solely in the exercise of discretion, and the applicant is subsequently granted withholding of deportation or removal under this section,

---

[4] Some circuits have explored the question of whether the BIA itself may conduct the required reconsideration, *see, e.g.*, *Huang*, 436 F.3d at 93, but the BIA itself seems to require remand to the IJ, *see In re T-Z-*, 24 I. & N. Dec. 163, 176 (BIA 2007).  In any event, given the nature of the fact-finding at issue here, as well as the BIA's prior remand to the IJ for the reconsideration mandated by § 1208.16(e), we will remand with instructions that the Board follow that same procedure again.

thereby effectively precluding admission of the applicant's spouse or minor children following to join him or her, the denial of asylum shall be reconsidered. Factors to be considered will include the reasons for the denial and reasonable alternatives available to the applicant such as reunification with his or her spouse or minor children in a third country.

8 C.F.R. § 1208.16(e); *accord id.* § 208.16(e).[5]

---

[5] In December 2019, the Department of Homeland Security issued a proposed rule that would eliminate both 8 C.F.R. §§ 1208.16(e) and 208.16(e). Procedures for Asylum and Bars to Asylum Eligibility, 84 Fed. Reg. 69640-01 (proposed Dec. 19, 2019) (to be codified at 8 C.F.R. pts. 208, 1208). Because "administrative rules will not be construed to have retroactive effect unless their language requires this result," *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988)—and as the Government conceded at argument, the proposed rule contains no language stating that it will apply retroactively— and because rules that "alter existing rights or obligations" may apply only prospectively, *see Appalachian States Low-Level Radioactive Waste Comm'n v. O'Leary*, 93 F.3d 103, 113 (3d Cir. 1996); *see also* 5 U.S.C. § 551(4) (agency rules may have only "future effect")); *see Levy v. Sterling Holding Co.*, 544 F.3d 493, 506 (3d Cir. 2008), the proposed rule would apply only prospectively and would not control Sathanthrasa's appeal. Notably, however, the proposed rule also makes clear that family unification is, and would remain, a "crucial factor in weighing asylum as a discretionary matter." Procedures for

As our sister circuits have recognized, it is both logical and reasonable that reconsideration of asylum is mandatory for a petitioner in this "unusual legal status." *Zuh v. Mukasey*, 547 F.3d 504, 508 (4th Cir. 2008) (quoting *Huang*, 436 F.3d at 95). That is because the petitioner has more than satisfied the "well-founded fear of persecution" standard required for asylum by qualifying for withholding of removal. *Ghebrehiwot v. Att'y Gen.*, 467 F.3d 344, 351 (3d Cir. 2006) (quoting 8 U.S.C. § 1101(a)(42)). At the same time, however, having won only withholding of removal, that same petitioner will be "ineligible to become a lawful permanent resident here, unable to reunite his family as derivative asylees, and subject to deportation to a willing third country." *Zuh*, 547 F.3d at 508.

To understand what is required on reconsideration under § 1208.16(e), we must begin with what is required in the normal course. For while an IJ's reconsideration of asylum under § 1208.16(e) may be mandatory, the granting of asylum is not. *Serrano-Alberto v. Att'y Gen.*, 859 F.3d 208, 214 (3d Cir. 2017). To be sure, a petitioner seeking asylum must establish statutory eligibility by demonstrating either "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42); *see id.* § 1158(b)(1)(A). But statutory eligibility for asylum does not give rise to a "right to remain in the United States." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 443 (1987) (emphasis

Asylum and Bars to Asylum Eligibility, 84 Fed. Reg. at 69,657 (quoting *Fisenko v. Lynch*, 826 F.3d 287, 292 (6th Cir. 2016)).

omitted).  The petitioner must carry her burden of "establishing that the favorable exercise of discretion is warranted," *Huang*, 436 F.3d at 97, and the grant of asylum—*ab initio* or on reconsideration—ultimately rests in the Attorney General's discretion.  *Id.* at 95; *see Serrano-Alberto*, 859 F.3d at 214.

But that discretion is not limitless.  "[T]he BIA has established—and federal courts have enforced—extensive limitations on an IJ's exercise of discretion."  *Huang*, 436 F.3d at 97 (collecting cases).  Even on initial consideration of asylum, the IJ "must examine the totality of the circumstances" to determine whether a petitioner is entitled to a discretionary grant of asylum.  *Id.* at 98; *accord Zuh*, 547 F.3d at 510–11.

Our sister circuits have helpfully set forth a non-exhaustive list of positive and negative factors that we also adopt today to guide the IJ's exercise of discretion in assessing an asylum application.  *See, e.g.*, *Huang*, 436 F.3d at 98 (collecting cases).  Positive factors include:

> 1) Family, business, community, and employment ties to the United States, and length of residence and property ownership in this country;
>
> 2) Evidence of hardship to the alien and his family if deported to any country, or if denied asylum such that the alien cannot be reunited with family members (as derivative asylees) in this country;
>
> 3) Evidence of good character, value, or service to the community, including proof of genuine rehabilitation if a criminal record is present;

13

4) General humanitarian reasons, such as age or health; [and]

5) Evidence of severe past persecution and/or well-founded fear of future persecution, including consideration of other relief granted or denied the applicant (e.g., withholding of removal or CAT protection).

*Zuh*, 547 F.3d at 511; *see also Shahandeh-Pey v. INS*, 831 F.2d 1384, 1387 (7th Cir. 1987) (listing positive factors).

Negative factors include:

1) Nature and underlying circumstances of the exclusion ground;

2) Presence of significant violations of immigration laws;[6]

---

[6] We note that while violations of immigration laws are properly part of the inquiry, *see, e.g.*, *In re A-B-*, 27 I. & N. Dec. 316, 345 n.12 (Att'y Gen. 2018), *overruled in other part by Grace v. Whitaker*, 344 F. Supp. 3d 96 (D.D.C. 2018), "this factor itself involves a totality of the circumstances inquiry," including whether the violation stemmed from an imminent need to escape persecution, *Zuh*, 547 F.3d at 511 n.4; *In re Pula*, 19 I. & N. Dec. 467, 472–75 (BIA 1987), *superseded in other part by regulation as recognized in Andriasian v. INS*, 180 F.3d 1033, 1043–44 & n. 17 (9th Cir. 1999); *see also In re Kasinga*, 21 I. & N. Dec. 357, 368 (BIA 1996).

3) Presence of a criminal record and the nature, recency, and seriousness of that record, including evidence of recidivism;

4) Lack of candor with immigration officials, including an actual adverse credibility finding by the IJ; [and]

5) Other evidence that indicates bad character or undesirability for permanent residence in the United States.

*Zuh*, 547 F.3d at 511 (footnote omitted); *see also Shahandeh-Pey*, 831 F.2d at 1388 (listing negative factors).

In weighing these factors and making a discretionary asylum determination, an IJ need not expressly address every factor, "[b]ut at the very least, [the] IJ must demonstrate that he or she reviewed the record and balanced the *relevant* factors and must discuss the positive or adverse factors that support his or her decision." *Zuh*, 547 F.3d at 511; *see Gulla v. Gonzales*, 498 F.3d 911, 916 (9th Cir. 2007); *Huang*, 436 F.3d at 98–99; *In re Chen*, 20 I. & N. Dec. 16, 19 (BIA 1989). This explicit requirement of balancing is consonant with the principle that we may affirm an agency's decision only on "the grounds invoked by the agency" and the concomitant rule that those grounds "must be set forth with such clarity as to be understandable." *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947); *see Wang v. Att'y Gen.*, 423 F.3d 260, 270 (3d Cir.

2005) (same); *Dia v. Ashcroft*, 353 F.3d 228, 241 (3d Cir. 2003) (en banc) (same).[7]

These lessons apply to both the original consideration of asylum and its reconsideration under 8 C.F.R. § 1208.16(e). But when it comes to reconsideration of a discretionary denial of asylum under § 1208.16(e), four points bear particular emphasis.

First, where a petitioner has satisfied the even more demanding standard for persecution for withholding of removal, *a fortiori* she has demonstrated a well-founded fear of future persecution, and a well-founded fear of persecution "outweigh[s] all but the most egregious adverse factors." *Zuh*, 547 F.3d at 512 (alteration in original) (quoting *Huang*, 436 F.3d at 98); *see Marouf v. Lynch*, 811 F.3d 174, 180 (6th Cir. 2016) (cataloging a handful of cases in which "egregious conduct" justified the "unusual" outcome of a discretionary denial of asylum (citations omitted)); *Kalubi v. Ashcroft*, 364 F.3d 1134, 1141 (9th Cir. 2004); *Shahandeh-Pey*, 831 F.2d at 1388; *In re Kasinga*, 21 I. & N. Dec. 357, 367 (BIA 1996) (en banc); *In re H-*, 21 I. & N. Dec. 337, 348 (1996) (en banc). That is so even when a petitioner has been granted another form of relief, such as withholding. *See Zuh*, 547 F.3d at 512 n.5; *Huang*, 436 F.3d at 98 n.11. Otherwise, "those very asylum-seekers who met the higher standard of proof of persecution required for withholding of removal (and thus

---

[7] The balancing requirement can be satisfied, however, so long as the IJ sets forth his or her reasoning with sufficient clarity. *Chenery* does not command that both the IJ and BIA expressly set forth their reasoning. *Dia*, 353 F.3d at 243.

those persons most in need of this nation's asylum relief) would be the ones who received less protection." *Zuh*, 547 F.3d at 512 n.5 (quoting *Huang*, 436 F.3d at 98 n.11).

Second, in making any discretionary asylum determination, an IJ should consider "[e]vidence of hardship to the alien and his family if . . . denied asylum such that the alien cannot be reunited with family members (as derivative asylees) in this country." *Zuh*, 547 F.3d at 511. But this factor *must* be considered on reconsideration of the discretionary denial of asylum under § 1208.16(e). As the regulation makes clear by its terms, its primary purpose is to address the fact that "[i]n the event that an applicant is denied asylum solely in the exercise of discretion . . . [and] is subsequently granted withholding of . . . removal," the discretionary denial of asylum "thereby effectively preclud[es] admission of the applicant's spouse or minor children following to join him or her." 8 C.F.R. § 1208.16(e). That is because only an asylee can petition to have family members enter the United States as derivative asylees. *See* 8 U.S.C. § 1158(b)(3)(A). With that precious possibility at stake, the regulation ensures that "[f]actors to be considered *will include* . . . reasonable alternatives available to the applicant such as reunification with his or her spouse or minor children in a third country." 8 C.F.R. § 1208.16(e) (emphasis added).

Third, it is not sufficient on reconsideration for the IJ to consider and address only the factor of reasonably available alternatives to family reunification. While that factor carries significant weight, the IJ must also consider the "reasons for the denial" of asylum. 8 C.F.R. § 1208.16(e). By mandating that the IJ consider the "reasons for the denial *and* reasonable alternatives" for family reunification in the conjunctive, *id.* (emphasis added), the regulation makes clear that a de novo

17

reweighing of the positive and negative factors is required. *See Alimbaev v. Att'y Gen.*, 872 F.3d 188, 201 (3d Cir. 2017) (instructing that on remand, the immigration agency must reconsider the factor on which it erred "before [then] weighing the various positive and negative factors"). In that reweighing, moreover, the IJ must pay special attention to the availability of "reasonable alternatives" for family reunification, 8 C.F.R. § 1208.16(e), and to the principle that a well-founded fear of persecution "outweigh[s] all but the most egregious adverse factors," *Zuh*, 547 F.3d at 512 (alteration in original) (citation omitted).

Fourth, the need for the IJ to identify and discuss the factors informing her decision is all the more acute on reconsideration under § 1208.16(e). "Discretionary denials of asylum are exceedingly rare," *Huang*, 436 F.3d at 92, and are "even more rare when the IJ or BIA has found the applicant entitled to withholding of removal," *Zuh*, 547 F.3d at 507. For that reason, they are carefully scrutinized by the Courts of Appeals and have been vacated where the IJ failed to balance the relevant factors, *see Huang*, 436 F.3d at 99; *see also Shahandeh-Pey*, 831 F.2d at 1387–90; where the IJ's conclusion was internally inconsistent, *see Marouf*, 811 F.3d at 190; *Zuh*, 547 F.3d at 513; or where the IJ failed to provide sufficient explanation for the reviewing court to determine that she "heard, considered, and decided" the issue, *Kalubi*, 364 F.3d at 1141 (citation omitted). In the ordinary course, an IJ is expected to "demonstrate that he or she reviewed the record and balanced the *relevant* factors and [to] discuss the positive or adverse factors that support his or her decision," *Zuh*, 547 F.3d at 511; when reconsidering the discretionary denial of asylum under § 1208.16(e), a thoughtful balancing and robust

discussion is essential both to ensure the IJ's decision is sound and to render it capable of meaningful review.

## B. Application to the BIA's and IJ's opinions

With these principles in mind, we readily conclude that the IJ here did not properly reconsider his discretionary denial of asylum under § 1208.16(e) and that the BIA erred in finding it sufficient that the IJ "was aware of the situation and its implications," JA 8.

First, having determined that Sathanthrasa had a well-founded fear of persecution, the IJ should have considered that factor to "outweigh[] all but the most egregious adverse factors." *Zuh*, 547 F.3d at 512. Instead, the IJ grounded the discretionary denial of asylum on Sathanthrasa's failure to establish past persecution and his purported "ulterior motive" for traveling to the United States. JA 39. The IJ made no mention of the weight to be accorded Sathanthrasa's well-founded fear of persecution, nor did he explain how the factors he identified were sufficiently egregious to outweigh the credible threat of harm Sathanthrasa faced if returned to Sri Lanka. *See Zuh*, 547 F.3d at 512; *Huang*, 436 F.3d at 98, 100; *Shahandeh-Pey*, 831 F.2d at 1388.

Second, family reunification should have been treated as relevant both to the IJ's original decision and on his reconsideration. *See* 8 C.F.R. § 1208.16(e); *Huang*, 436 F.3d at 101; *In re T-Z-*, 24 I. & N. Dec. 163, 176 (BIA 2007). Yet on neither occasion was that factor clearly considered. In the first instance, the IJ stated that he was "not concerned" and "d[id not] care about" family reunification. JA 138–39. He even went so far as to assert that family reunification "ha[d] nothing to do with [his] decision." JA 139. And on

19

reconsideration, even though the BIA remanded with specific instructions to consider family circumstances, the IJ failed to mention, much less discuss, family reunification, relegating to a footnote the cryptic comment that he "ha[d] considered 8 C.F.R. § 208.16(e) in this regard." JA 39 n.2. That cursory treatment only reinforces our concern that the IJ indeed treated family unification as having "nothing to do with [his] decision," JA 139. *See Zuh*, 547 F.3d at 512 (citing *Huang*, 436 F.3d at 99).

Third, although § 1208.16(e) requires reconsideration of the "reasons for the denial," there is no indication in the record that the IJ engaged in a de novo balancing of factors on reconsideration. He failed to discuss any positive factors weighing in favor of asylum, inexplicably ignoring both Sathanthrasa's well-founded fear of persecution, which he credited for purposes of withholding of removal, and the regulation's express requirement of consideration of family reunification. Instead, the IJ recited, almost verbatim, the same negative factors he originally identified as grounds for his initial denial of asylum, namely Sathanthrasa's failure to establish past persecution and his "ulterior motive" for traveling to the United States. JA 38–39. The IJ's treatment of those negative factors was problematic in and of itself.[8] But

---

[8] First, as intervening case law has made clear, violence and threats of violence must be considered cumulatively for purposes of assessing past persecution. *See Doe v. Att'y Gen.*, 956 F.3d 135, 143–44 (3d Cir. 2020); *Herrera-Reyes v. Att'y Gen.*, 952 F.3d 101, 106–07 (3d Cir. 2020) (collecting cases). Yet the IJ focused only on the facts that Sathanthrasa had not been "serious[ly]" injured by the Karuna Group or beaten by the police and had not suffered further abuse after 2009. JA

even accepting those factors at face value, the IJ erred in failing to explain why those factors should be considered among "the most egregious adverse factors" capable of outweighing not only Sathanthrasa's well-founded fear of persecution but also

---

38. In doing so, the IJ failed to consider the kidnappings of Sathanthrasa's three siblings; his father's beating; his mother's testimony that she was held at gunpoint while one of his brothers was abducted; the threat that he would be killed when members of the Karuna Group pointed a gun at him and told him to "run away without turning and looking back," JA 115; or the cryptic threat that he should stay at his father's house "without going anywhere" because his father's attackers would "come back," JA 118. Second, an adverse credibility determination is not properly based on an absence of testimony when "no one ever asked" the petitioner for clarification. *See Li Wu Lin v. INS*, 238 F.3d 239, 246 (3d Cir. 2001); *see also Dia*, 353 F.3d at 250 (an adverse credibility determination must be based on "specific, cogent reason[s]" not "speculation, conjecture, or an otherwise unsupported personal opinion"). But while neither the Government nor the IJ requested an explanation from Sathanthrasa, the IJ discredited his stated reason for his delayed departure on the ground that he "did not explain why his family could not have simply sold their personal property much earlier." JA 38. Because we conclude the IJ's failure to weigh family reunification in the mix requires a remand for full reconsideration of the discretionary denial of asylum, *Huang*, 436 F.3d at 101, including the "reasons for the denial," 8 C.F.R. § 1208.16(e), there will be ample opportunity on remand for the IJ to reconsider the past persecution determination and to explore Sathanthrasa's stated reason for his delay in leaving Sri Lanka with these cases in mind.

the hardship he would suffer if he could not reunite with his wife and children. *See Zuh*, 547 F.3d at 512 (citation omitted); *Huang*, 436 F.3d at 98–99, 102 (remanding to the agency when the IJ abused his discretion by focusing only on negative factors); *Shahandeh-Pey*, 831 F.2d at 1388–90.

The BIA then compounded these errors by concluding, without analysis, that the IJ was aware of "the only [two] positive factors" Sathanthrasa had identified: (1) that a "grant of withholding of removal was not as beneficial to him" as a grant of asylum; and (2) that "Tamils have suffered a genocide." JA 8. The implication from the BIA's opinion and the thrust of the Government's argument on appeal is that Sathanthrasa failed to carry his burden of identifying positive factors that weighed in favor of a discretionary grant of asylum. But while the burden of establishing entitlement to a discretionary grant of asylum rests on the petitioner, *Huang*, 436 F.3d at 97, special considerations apply on reconsideration pursuant to § 1208.16(e). At that point, not only has the petitioner established a well-founded fear of persecution, but also the IJ *must* consider family circumstances. 8 C.F.R. § 1208.16(e). An IJ who fails to follow those mandates—or worse, disavows them—necessarily abuses her discretion. *Cf. Filja v. Gonzales*, 447 F.3d 241, 254 (3d Cir. 2006). The Government's position to the contrary is particularly baffling on the record before us: Why should we fault Sathanthrasa for failing to present evidence of the hardships caused by family separation when the IJ short-circuited that discussion by stating, over the objections of Sathanthrasa's counsel, that he was "not concerned about that," JA 138, and that it had "nothing to do with [his] decision," JA 139?

Finally, the explications of the IJ and BIA leave much to be desired. The sole indication that the IJ understood his duty to

22

reconsider a discretionary denial of asylum is the stray footnote stating he had "considered 8 C.F.R. § 208.16(e)." JA 39 n.2. That passing mention does not allow us, as the reviewing court, to determine that he "heard, considered, and decided" the issue. *Kalubi*, 364 F.3d at 1141 (citation omitted). To the contrary, it leaves us with nothing of substance to review. *Cf. Awolesi v. Ashcroft*, 341 F.3d 227, 232 (3d Cir. 2003) ("[T]o give meaningful review to the BIA's decision, we must have some insight into its reasoning."). The BIA's opinion is no less concerning: The sole justification for its affirmance was its assertion that the IJ "was aware of the situation and its implications." JA 8. We do not share that confidence in view of the internal inconsistency of the IJ's crediting Sathanthrasa's well-founded fear of persecution for purposes of withholding but not for asylum, the IJ's explicit refusal to consider family circumstances, and the absence of any indication that the IJ conducted a de novo review of the factors weighing for and against asylum.

### III. CONCLUSION

In sum, because the IJ did not reconsider the discretionary denial of asylum in this case in the manner required by § 1208.16(e) and our case law, he abused his discretion. Accordingly, we will grant Sathanthrasa's petition, vacate the BIA's order, and remand to the BIA with instructions for the IJ to properly reconsider the discretionary denial of asylum.