[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-10339

Non-Argument Calendar

_____

FOAD KARIM FARAHI,

Petitioner,

*versus*

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
Agency No. A096-087-879

_____

Before JORDAN, LUCK, and TJOFLAT, Circuit Judges.

PER CURIAM:

Petitioner Foad Farahi seeks review of the Board of Immigration Appeals' (BIA) final order dismissing his appeal of the Immigration Judge's (IJ) discretionary denial of his application for asylum for two reasons. First, he argues that the BIA erred because it failed to remand the case to the IJ for reconsideration in light of 8 C.F.R. § 1208.16(e) and *Thamotar v. United States Attorney General*, 1 F.4th 958 (11th Cir. 2021). Second, he argues that the BIA erred because it failed to find that the IJ did not consider the totality of the circumstances when deciding and rejecting his asylum application. Farahi asserts that the IJ improperly weighed a Federal Bureau of Investigation (FBI) agent's memo and testimony, which detailed his connections with individuals later convicted of terrorism charges. For the reasons below, Farahi's petition is dismissed in part and denied in part.

## I. Background

Around December 30, 1993, Farahi was admitted to the U.S. on a nonimmigrant F-1 student visa and was allowed to stay until February 28, 2001. In 2002, the Department of Homeland Security (DHS) served Farahi with a notice to appear and charged him as removable. The DHS alleged that Farahi was a Kuwaiti native and an Iranian citizen and that he remained in the United States longer

than permitted, in violation of Immigration and Nationality Act (INA) § 237(a)(1)(B), 8 U.S.C. § 1227(a)(1)(B).[1]

### A. Applications and Hearings

Farahi applied for asylum, statutory withholding of removal, and withholding of removal under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT). In 2004, at an initial hearing before an IJ, Farahi conceded the removal charge. Later, at a 2007 merits hearing, Farahi withdrew his asylum application and sought voluntary departure, which the IJ granted.

In 2009, after failing to voluntarily depart, Farahi filed an unopposed motion to reopen his asylum case based on changed conditions in Iran. The next year, the BIA granted Farahi's motion. In 2013, Farahi petitioned to adjust his status based on his marriage to a U.S. citizen. The U.S. Citizenship and Immigration Services approved Farahi's petition.

A year later, the DHS submitted a memo written by FBI Special Agent Andrew Lenzen. Special Agent Lenzen—who had twice interviewed Farahi in 2004—documented Farahi's connections to high-level terrorists, his failure to pay income taxes, and his responses to questions about his political views.

---

[1] Under 8 U.S.C. § 1227(a)(1)(B), "[a]ny alien who is present in the United States in violation of [the INA] or any other law of the United States . . . is deportable."

In 2017, before his status adjustment hearing, Farahi's wife filed for divorce. At the hearing, Farahi, and his wife testified about their marriage and stated that they were still living together. Also at the hearing, Farahi sought to amend his adjustment of status application to list his membership in associations he neglected to include on the form, including: the Muslim American Society, the Syrian American Council, the Council on American Islamic Relations, and the Shamsuddin Islamic Center. He also reported that he was arrested for driving with a suspended license three times. Months after the hearing, the DHS moved to pretermit Farahi's status adjustment application based on his divorce, which the IJ granted.

In 2019, Farahi again applied for asylum, statutory withholding of removal, and withholding of removal under CAT. He alleged that he was a Sunni Muslim who would be persecuted in Iran because of his religion. He noted that he was unmarried and had no children.

Later that year, Farahi testified before the IJ at a merits hearing about his asylum application. Farahi explained that, as a Sunni Muslim, he feared being deported to Iran because it was a predominantly Shi'a Muslim country. He also stated that his loyalty to Iran would be questioned because he lived in the United States for over twenty-five years. Farahi noted that he had two master's degrees, a bachelor's degree, and an associate's degree—all from American universities. As for work, he said that he was an imam at the

Shamsuddin Islamic Center and that he sold and produced personal care products.

Also during the merits hearing, Jack Lieberman—a Jewish community leader—testified on Farahi's behalf.  Lieberman stated that Farahi always worked to promote understanding and compromise between Jews and Muslims at Jewish-Arab Dialogue Association meetings.

The Government presented testimony from Special Agent Lenzen, who reiterated information from his memo.  Among other things, Special Agent Lenzen testified that, in 2003, an FBI source identified Farahi as a recruiter for the Egyptian Muslim Brotherhood.  At that time, the Egyptian Muslim Brotherhood was connected to Khaled Sheikh Mohamed and other known Al Qaeda members.  He also testified that Farahi was linked to multiple convicted or indicted terrorists, including Adnan Shukrijumah,[2] Jose

---

[2] Shukrijumah, known as "the Elvis of Al Qaeda" was listed on the FBI's most wanted list in the early 2000's.  In July 2010, he was indicted for his alleged role in a terrorist plot to attack targets in the United States and United Kingdom.

Padilla,[3] Mohammed Youssef,[4] and Adham Hassoun.[5]   Special
Agent Lenzen also noted Farahi's support for charities that fi-
nanced terrorism, such as the Holy Land Foundation, the Global
Relief Foundation, and Kindhearts International.[6]

## B.  *The IJ's Decision*

After the merits hearing, the IJ denied Farahi's application
for asylum, statutory withholding of removal as to Kuwait, and
withholding of removal under CAT.  But the IJ granted statutory
withholding of removal as to Iran.  The IJ found Farahi's testimony
conflicted with his asylum application.  Among other inconsisten-
cies, the IJ noted that Farahi testified that he had resigned from an
Islamic center in 2008, but Farahi's asylum application showed that
he was still employed there.  The IJ also highlighted issues with

---

[3] Padilla was convicted of conspiring to murder, kidnap, or maim persons in a foreign country, in violation of 18 U.S.C. § 956(a)(1); conspiring to provide material support for terrorism, in violation of 18 U.S.C. § 372; and providing material support to terrorists, in violation of 18 U.S.C. § 2339A(a).  *See United States v. Jayyousi*, 657 F.3d 1085, 1091 (11th Cir. 2011).  The charged conduct occurred between October 1993 and November 1, 2001.  *Id.*

[4] A federal grand jury indicted Youssef under the same charges as Padilla.  *Id.*  Youssef was not arrested in the United States; instead, he was arrested, con-victed, and sentenced in Egypt for other terrorist activity.

[5] Hassoun was also convicted under the same charges as Padilla.  *Id.*  Per Farahi, Hassoun was his father-in-law's cousin.

[6] The Holy Land and Global Relief Foundations were identified as Specially Designated Global Terrorists under the authority of Executive Order 13,224. The Treasury Department froze Kindhearts' assets under the same executive order when it learned that Kindhearts had raised money for Hamas.

Farahi's depiction of his marriage.  The IJ explained that Farahi had "'delayed proceedings because he failed to disclose his separation from [his wife] until he was confronted with evidence and questioned on cross examination' during the merits hearing on his adjustment of status application."  The IJ concluded that although he had submitted corroborating evidence and testimony from several witnesses, that evidence failed to rehabilitate Farahi's credibility because it did not adequately address the inconsistencies and implausibility of his testimony.

As to the merits of Farahi's applications, the IJ denied Farahi's asylum application because it was untimely under 8 U.S.C. § 1158(a)(2)(B).[7]  The IJ found that Farahi was admitted to the United States in 1993, but did not apply for asylum relief until August 29, 2002.  The IJ determined that Farahi "established extraordinary circumstances because [he] maintained lawful nonimmigrant status in the United States until February 28, 2001, when his F-1 student visa lapsed."  Yet, the IJ concluded that Farahi

---

[7] Under 8 U.S.C. § 1158(a)(2)(B), an asylum applicant must file for relief "within 1 year" of the applicant's arrival in the United States.  *See also* 8 C.F.R. § 1208.4(a)(2)(ii) ("The 1-year period shall be calculated from the date of the alien's last arrival in the United States or April 1, 1997, whichever is later.").  The one-year deadline does not apply if the applicant "demonstrates to the satisfaction of the Attorney General either the existence of changed circumstances which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay in filing an application within the [one-year] period."  8 U.S.C. § 1158(a)(2)(D).

waited an unreasonable amount of time to file his asylum application after his F-1 visa lapsed.

Alternatively, the IJ considered whether Farahi merited a favorable exercise of discretion.  The IJ first recognized the positive factors that weighed in favor of Farahi's application.  The IJ noted Farahi's evidence of his ties to the community and his efforts to accomplish peace by participating in organizations focused on unity, dialogue, and compromise.  The IJ also outlined the negative factors weighing against granting asylum.  The IJ noted that Farahi had: (1) no children and was unmarried, (2) no family ties in the United States, (3) no business ties to the United States, (4) a criminal record, (5) several connections to terrorists and terrorism organizations, and (6) failed to file federal tax returns.  The IJ found that the negative factors outweighed the positive ones and exercised her discretion to deny Farahi's asylum application.

The IJ then discussed Farahi's withholding of removal application.  The IJ granted statutory withholding of removal as to Iran. The IJ found that Farahi was not subject to any statutory bars and that there was sufficient evidence to support that he was a Sunni Muslim who faced a future threat of persecution based on his religion and political opinions if he was deported to Iran.  But the IJ denied Farahi's withholding of removal claim related to Kuwait. The IJ determined that Farahi provided no evidence showing that he had a fear of returning to Kuwait based on either past or future threats.

Last, the IJ discussed Farahi's application for CAT relief. The IJ denied Farahi's application for CAT relief because she found that he "failed to demonstrate that it [was] more likely than not that he w[ould] be tortured in Kuwait." Though Farahi testified that he had endured past harm in Kuwait, the IJ explained that the court had found Farahi's testimony not credible. Because he lacked credibility, the IJ explained that Farahi "would have to provide additional evidence" but failed to do so. The IJ further rejected the possibility that "Kuwaiti government officials would acquiesce to any future abuse or threats against" Farahi based on a U.S. State Department report, which noted efforts taken by the Kuwaiti government to prevent such threats and abuse.

## C. The BIA's Decision

Farahi appealed to the BIA. He argued that the IJ failed to adequately weigh his history in the United States against his prior convictions for driving with a suspended license, his failure to file tax returns, and his innocent interactions with individuals convicted of terrorism. He asserted that a grant of withholding of removal and a denial of asylum as a matter of discretion requires mandatory reconsideration in light of 8 C.F.R. § 1208.16(e) and *Thamotar*.[8] He argued that this inquiry "is not limited to

---

[8] A former version of § 1208.16(e) explains when "[r]econsideration of discretionary denial of asylum" is required. It states:

> In the event that an applicant is denied asylum solely in the exercise of discretion, and the applicant is subsequently granted withholding of deportation or removal under this section, thereby effectively precluding admission of the

reunification with family" and must include an evaluation of the applicant's inability to "apply for permanent residency in the United States, travel abroad freely, or petition for his family to join him as derivatives." Farahi asked the BIA to undertake de novo review of the reconsideration or remand the case for further fact-finding on this issue. He also argued that he was not a Kuwaiti national, and that he forfeited his right to reside in Kuwait when he left without a temporary resident status.

The BIA affirmed the IJ's decision and dismissed Farahi's appeal. The BIA adopted the IJ's reasoning except the IJ's conclusion about the one-year bar, which the BIA declined to reach. Rather, the BIA agreed with the IJ's discretionary decision that Farahi had not established extraordinary circumstances relating to the delay in filing his application. The BIA further found that there were no

---

applicant's spouse or minor children following to join him or her, the denial of asylum shall be reconsidered. Factors to be considered will include the reasons for the denial and reasonable alternatives available to the applicant such as reunification with his or her spouse or minor children in a third country.

8 C.F.R. § 1208.16(e) (2020).

On November 20, 2020, the Department of Justice removed and reserved 8 C.F.R. § 1208.16(e). *See* Procedures for Asylum and Bars to Asylum Eligibility, 85 Fed. Reg. 67202, 67202 (Oct. 21, 2020). Still, it is undisputed that § 1208.16(e) is still in effect here. "[A]dministrative rules will not be construed as having retroactive effect unless their language requires this result." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). And nothing in the final rule removing § 1208.16(e) suggests a retroactive effect.

changed circumstances in Kuwait that materially affected Farahi's application.

The BIA rejected Farahi's argument that the IJ erroneously weighed the positive and negative factors affecting his application. The BIA also concluded that mandatory reconsideration under § 1298.16(e) and *Thamotar* was not required. It reasoned that, unlike the respondent in *Thamotar*, Farahi made no claim that the discretionary denial of asylum affected his ability to be reunited with any spouse or minor child who would be effectively precluded from admission to the U.S. And unlike in *Thamotar*, there were no outstanding factual questions requiring remand. The BIA therefore determined that 8 C.F.R. § 1208.16(e) was inapplicable and that remand for reconsideration of the discretionary denial of asylum was neither mandatory nor merited.

Last, the BIA reconsidered the discretionary denial under 8 C.F.R. § 1208.16(e) itself—as requested by Farahi. Still, the BIA came to the same conclusion as the IJ. It noted that Farahi failed to dispute the IJ's credibility finding. And, "after considering the totality of the circumstances," it found that "the balancing conducted by the [IJ was] correct and the denial of asylum [was] warranted." Farahi timely appealed.

## II.  Legal Standards

A few legal standards govern our review. First, "[w]e review only the BIA's decision, except where the BIA expressly adopts or explicitly agrees with the [IJ's] opinion." *Thamotar*, 1 F.4th at 969. "In such cases, we review the [IJ's] opinion to the extent the BIA

found that the [IJ's] reasons were supported by the record, and we review the BIA's decision with regard to those matters on which it rendered its own opinion and reasoning." *Id.*

Second, "[w]e review the BIA and [IJ's] legal conclusions *de novo.*" *Id.* And "[w]e review factual findings under the substantial evidence test." *Id.* Under the substantial evidence test, we must "affirm the agency's factual findings so long as they are 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" *Id.* (quoting *Lingeswaran v. U.S. Att'y Gen.*, 969 F.3d 1278, 1286 (11th Cir. 2020)). "We view the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in its favor." *Id.* Thus, "[w]e will reverse 'factual findings only if the record compels reversal, and the mere fact that the record may support a contrary conclusion is insufficient to justify reversal.'" *Jathursan v. U.S. Att'y Gen.*, 17 F.4th 1365, 1372 (11th Cir. 2021) (quoting *Lopez v. U.S. Att'y Gen.*, 914 F.3d 1292, 1297 (11th Cir. 2019)).

Last, "the standard of review for a discretionary denial of asylum is set out in 8 U.S.C. § 1252(b)(4)(D), which provides that a discretionary decision granting or denying asylum 'shall be conclusive unless manifestly contrary to law and an abuse of discretion.'" *Thamotar*, 1 F.4th at 969 (quoting 8 U.S.C. § 1252(b)(4)(D)).

## III. Discussion

Farahi argues that the BIA erred for two reasons: (1) it failed to remand the case to the IJ for reconsideration as required by § 1208.16(e) and *Thamotar*, and (2) it failed to find clear error in the

IJ's discretionary denial of asylum. We review and reject each argument in turn.

### A.　Remand for Reconsideration

Farahi first argues that the BIA erred because remand for reconsideration under § 1208.16(e) was mandatory. Relying on *Thamotar*, Farahi contends that "when an applicant is denied asylum in the exercise of discretion but granted withholding of removal and the [IJ] fails to reconsider its discretionary denial of asylum under 8 C.F.R. § 1208.16(e), the BIA must remand for the [IJ] to conduct this required reconsideration." 1 F.4th at 974. Farahi adds that the BIA erroneously and arbitrarily decided that the lack of family unification did not obligate it to remand to the IJ.

The Government argues that we should affirm the BIA's decision for two reasons. First, the Government contends that we should reject Farahi's argument because he did not exhaust his administrative remedies. The Government notes that Farahi did not argue that the BIA was required to remand the case to the IJ for reconsideration. Rather, Farahi gave the BIA the choice to either undertake de novo review or remand the case. Second, the Government asserts that Farahi's argument is meritless. According to the Government, both § 1208.16(e) and *Thamotar* deal with family reunification. But Farahi has neither a spouse nor minor children living abroad.

We need not dive into the merits of Farahi's mandatory remand argument because he failed to exhaust his administrative remedies by not making this argument to the BIA. Under

8 U.S.C. § 1252(d)(1), we may review a final order of removal only if the applicant "has exhausted all administrative remedies available to [them] as of right." "Requiring exhaustion allows the BIA to consider the niceties and contours of the relevant arguments, thereby 'full[y] consider[ing]' the petitioner's claims and 'compil[ing] a record which is adequate for judicial review.'" *Amaya-Artunduaga v. U.S. Att'y Gen.*, 463 F.3d 1247, 1250 (11th Cir. 2006) (alterations in original) (quoting *Dokic v. I.N.S.*, 899 F.2d 530, 532 (6th Cir. 1990) (per curiam)). Although exhaustion under § 1252(d)(1) is not jurisdictional, it "remains a 'claim-processing rule.'" *Kemokai v. U.S. Att'y Gen.*, 83 F.4th 886, 891 (11th Cir. 2023) (quoting *Santos-Zacaria v. Garland*, 598 U.S. 411, 417 (2023)). "And such a rule is generally applied where, as here, it has been asserted by a party." *Id.*; *see also Fort Bend Cnty. v. Davis*, 139 S. Ct. 1843, 1849 (2019).

Farahi did not argue that the BIA was required to remand the case to the IJ for reconsideration. As the Government notes, Farahi argued that the "Board must undertake a *de novo* review of the reconsideration *or* remand the case for further fact finding on this issue." (second emphasis added). To be sure, "exhaustion 'is not a stringent requirement' and is satisfied if the petitioner 'previously argued the "core issue now on appeal" before the BIA.'" *Kemokai*, 83 F.4th at 891 (quoting *Indrawati v. U.S. Att'y Gen.*, 779 F.3d 1284, 1297 (11th Cir. 2015)). By presenting a choice to the BIA between de novo review or remand, Farahi argued that remand was *not* mandatory. We therefore cannot say that Farahi argued the "core issue now on appeal." To the extent that Farahi seeks to raise

a new, unexhausted discrete argument on appeal, that part of his petition is dismissed. *See* 8 U.S.C. § 1252(d)(1).

### B. *Discretionary Denial of Asylum*

Farahi's second argument amounts to an abuse-of-discretion argument. He contends that the IJ failed to consider the totality of the circumstances as required by *Matter of Pula*, 19 I. & N. Dec. 467 (BIA 1987), and that positive equities favor granting him asylum. As to those positive equities, Farahi notes his degrees, his service as an imam, his personal care products business, Lieberman's testimony, and his lack of arrest or convictions—aside from his 2003 conviction for driving with a suspended license.

Farahi also faults the BIA because it failed to find that the IJ afforded improper weight to the FBI memo. Farahi suggests that the IJ mischaracterized his contacts with convicted terrorists. He adds that the IJ should not have afforded "substantial weight" to the FBI memo because: (1) it was prepared three years after Agent Lenzen interviewed Farahi; (2) it was prepared for the purpose of a DHS enforcement action, and not in the regular course of business; and (3) the contents of the memo contain double and triple hearsay. And citing *Matter of Arreguin De Rodriguez*, 21 I. & N. Dec. 38 (BIA 1995), and *Garces v. United States Attorney General*, 611 F.3d 1337, 1350 (11th Cir. 2010), he suggests that less weight should be afforded the memo. We disagree.

"[T]he agency's decision to grant or deny asylum is discretionary. The Attorney General has discretion to grant asylum to any noncitizen who meets the INA's definition of a 'refugee.'"

*Thamotar*, 1 F.4th at 970 (citation omitted) (quoting 8 U.S.C. § 1158(b)(1)(A)).  Under the INA, a refugee is

> any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A).

Although the BIA's decision to grant asylum is discretionary, "this discretion is not unlimited." *Thamotar*, 1 F.4th at 970. "[T]he BIA has stated that once an applicant has established eligibility, the discretionary decision to grant asylum must be based on the 'totality of the circumstances,' which involves balancing adverse factors against favorable ones." *Id.* (quoting *Matter of Pula*, 19 I. & N. Dec. at 473).  Those factors—among others—include, "whether the noncitizen passed through other countries before arriving in the United States, whether orderly refugee procedures were available to him in any country he passed through, whether he engaged in fraud, and whether general humanitarian considerations favor granting asylum, such as age or poor health." *Id.* at 971.

Neither the IJ nor the BIA abused their discretion.  Against the positive factors Farahi now stresses, the IJ noted several negative factors.  The IJ explained that Farahi: (1) was relatively young, (2) in good health, (3) failed to show any family ties to the United

States, (4) "presented no evidence that he would be subject to hardship unrelated to his claim, if he [was] removed," and (5) had a criminal record for driving with a suspended license. None of these factors were impermissible for the IJ to consider. *See In re H-*, 21 I. & N. Dec. 337, 347–48 (BIA 1996) (explaining that BIA case law recognizes that an applicant's "age, health, or family ties, should also be considered in the exercise of discretion"); *Matter of Pula*, 19 I. & N. Dec. at 474 ("[T]he danger of persecution should generally outweigh all but the most egregious of adverse factors."); *Matter of M-L-A-*, 26 I. & N. Dec. 360, 363 (BIA 2014) (noting an applicant's "absence of any criminal record"); *see also Thamotar*, 1 F.4th at 971 ("These precedential agency decisions 'are binding on . . . immigration judges' . . . ." (first omission in original) (quoting 8 C.F.R. § 1003.1(g)(1))).

What's more, as the IJ noted, the FBI memo contained other negative factors that weighed against granting Farahi asylum. The FBI memo stated that Farahi "had numerous connections to convicted terrorists, who provided material support to other terrorists or otherwise plotted against the United States." And it reported that Farahi had never filed federal income tax returns—at the time of the memo.[9]

---

[9] Farahi admits that "some of [his] tax returns for the prior fifteen-plus years were missing." Failure to pay income taxes is another factor the BIA has used to deny discretionary asylum. *See Matter of A-H-*, 23 I. & N. Dec. 774, 783 (BIA 2005) (denying asylum, in part, because the applicant failed to pay taxes).

Farahi makes much of the IJ's reliance on the FBI memo, and her finding that Farahi "declined to be a [confidential informant] despite his privileged position to observe suspicious behavior, and considering the opportunities he had because of his many connections to convicted terrorists and his position as Imam in a mosque frequented by some of them." Even without the FBI memo, the negative equities here could have supported the IJ's decision and the BIA's affirmance. The addition of the memo reinforces the IJ's decision and the BIA's affirmance. *See* 8 U.S.C. § 1158(b)(2)(A)(v) (noting that an applicant is ineligible for asylum if he or she provided support to a terrorist organization); *Matter of A-H-*, 23 I. & N. Dec. 774, 780 (BIA 2005) (denying asylum based on the applicant's ties to terrorist groups).

Still, it was not error for the IJ to rely on the FBI memo. Contrary to Farahi's assertions, nothing in *Matter of Arreguin De Rodriguez* and *Garces* makes the IJ's reliance on the FBI memo improper. Unlike the authors of the police reports in those cases, the author of the FBI memo here—Special Agent Lenzen—testified and was cross-examined. Much of Special Agent Lenzen's testimony was corroborated by Farahi himself. For example, Farahi admitted that he taught and employed Padilla and that he knew Shukrijumah, Youssef, and Hassoun. Farahi also admitted that he declined to be a confidential informant and that he collected money for the Holy Land Foundation. He also admitted that he attended part of Padilla's, Youssef's, and Hassoun's criminal trials.

As to the IJ's supposed mischaracterization of Farahi's connections to convicted terrorists, Farahi misses the IJ's broader point. That is, despite his connections and position, he was unwilling to help the FBI investigate and stop terrorism. That finding is supported by substantial evidence.

Consider Farahi's connection to Shukrijumah. Farahi and Shukrijumah attended the same mosque, at least for a few months.[10] And when Farahi became an imam at the mosque, he volunteered to drive Shukrijumah's father. According to Special Agent Lenzen, a source informed him that Farahi may have provided Shukrijumah's father status reports about his son. It is true that Shukrijumah was not a convicted terrorist, but he was later indicted and put on the FBI's most wanted list.

Or consider Farahi's connections to Padilla, Youssef, and Hassoun. Farahi taught, housed, and employed Padilla. Farahi and Youssef also attended the same mosque and taught classes together. Farahi attended the same mosque as Hassoun and married Hassoun's relative. Farahi may not have been an imam at the time, but he admits that he knew these persons and that he attended part of their criminal trials—where they were ultimately convicted on terrorism-related charges. So although the IJ's wording was

---

[10] It is unclear whether Farahi was an imam during this time. Farahi's brief explains that "[i]n December 2000, [he] became a temporary then permanent imam." But Farahi testified: "the last time I remember seeing [Shukrijumah] that's in February 2001, and I wasn't even an Imam at that time because I, I became an Imam April 2001."

imprecise, her broader point holds true: Farahi declined to help the FBI despite his connections to people later convicted of terrorism.

Even if "a discretionary denial is 'exceedingly rare[]'" in these circumstances, the question before us is whether the BIA abused its discretion. *Thamotar*, 1 F.4th at 971 (quoting *Sathanrasa v. Att'y Gen. United States*, 968 F.3d 285, 296 (3d Cir. 2020)). It did not. The IJ's decision to deny Farahi's asylum application and the BIA's decision to affirm were supported by substantial evidence. And considering the evidence in the light most favorable to the agency's decision, Farahi fails to show that he is entitled to asylum given the negative equities that weighed against him. *See id.* at 970; *Diallo*, 596 F.3d at 1332.

### IV. Conclusion

We therefore dismiss Farahi's petition as it pertains to his argument that the BIA was required to remand his case for reconsideration under 8 C.F.R. § 1208.16(e). And we deny his petition as it relates to the IJ's discretionary denial of his asylum application and the BIA's affirmance of the IJ's decision.

**PETITION DISMISSED IN PART AND DENIED IN PART.**