**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-3204
_____

JATHURSAN THANKARASA,
                                        Appellant

v.

ATTORNEY GENERAL OF THE UNITED STATES
_____

On Petition for Review of a Decision of the Board of
Immigration Appeals
(A240-087-525)
Immigration Judge: Adam Panopoulos
_____

Argued December 10, 2024
_____

Before:  BIBAS, CHUNG, and ROTH, <u>Circuit Judges</u>

(Filed: April 10, 2025)

Visuvanathan Rudrakumaran **[ARGUED]**
Law Office of Visuvanathan Rudrakumaran
875 Avenue of Americas, Suite 2309

New York, NY 10001
    *Counsel for Petitioner*

Joannabelle Aquino
Allison Frayer **[ARGUED]**
U.S. Department of Justice, Civil Division
P.O. Box 878,
Ben Franklin Station
Washington, D.C. 20044
    *Counsel for Respondent*

_____

OPINION OF THE COURT
_____

CHUNG, Circuit Judge.

Petitioner Jathursan Thankarasa, a native and citizen of Sri Lanka, seeks review of the Board of Immigration Appeals' ("BIA") dismissal of his appeal of an Immigration Judge's ("IJ") order. In that order, the IJ granted Thankarasa's application for withholding of removal, but upon both initial review and reconsideration, the IJ denied Thankarasa's application for asylum. Thankarasa argues that the IJ abused his discretion in failing to consider evidence favorable to Thankarasa and in determining that Thankarasa's fraudulent conduct outweighed the equities in Thankarasa's favor. We disagree and will deny the petition.

I.    BACKGROUND

Thankarasa is an ethnically Tamil citizen of Sri Lanka, "a country whose modern history has been marked by civil

unrest and violence among the Sinhalese, Moor, and Tamil populations." Sathanthrasa v. Att'y Gen., 968 F.3d 285, 290 (3d Cir. 2020) (citing Mohideen v. Gonzalez, 416 F.3d 567, 568 (7th Cir. 2005)). On February 7, 2021, Thankarasa participated in a protest in support of Tamil rights and was arrested. The police beat, yelled at, and interrogated Thankarasa to determine if he was planning pro-Tamil terrorist acts against the Sri Lankan government. Thankarasa was kept overnight at the police station and released the following day.

Over the next several weeks, Thankarasa was harassed by groups of unknown people who appeared at his house unannounced, threatened his life, and attempted to kidnap him. Thankarasa was also called back to the police station, accused of helping terrorists, interrogated, and beaten once again. To avoid further harassment, abuse, and detention, Thankarasa decided to leave Sri Lanka.

After hiring a smuggler, who provided Thankarasa with a Sri Lankan passport, Thankarasa left Sri Lanka. At the direction of the smuggler, Thankarasa spent two years traveling through Europe, stopping in Romania, Belgium, France, and Portugal. Throughout these travels, Thankarasa used the Sri Lankan passport given to him by the smuggler. He did not seek asylum or other immigration benefits from any of the countries in which he stopped.

Just before Thankarasa came to the United States, the smuggler gave him a genuine French passport belonging to another person. The smuggler instructed Thankarasa to memorize the passport's details and assume the identity of the passport holder when interacting with immigration officers in the United States. Thankarasa then flew from Portugal to the

3

United States.  Upon his arrival, he presented the French passport to an immigration officer as planned.  At no point during this interaction did Thankarasa tell the immigration officer that he was seeking asylum or any other form of immigration protection.

Because the immigration officer suspected Thankarasa of using a fraudulent travel document, he sent Thankarasa to secondary screening.  There, Thankarasa admitted that the French passport did not belong to him, and stated that his purpose for coming to the United States was "[t]o claim asylum."  App. 303.  During this interview, Thankarasa was asked "Are you applying for admission to the United States utilizing the Visa Waiver Program today?" [1] to which he responded, "I do not know.  [The smuggler] just gave me an electronic copy of the [visa]."  App. 303.  Thankarasa was apparently referring to an Electronic System for Travel Authorization (ESTA), an approved travel authorization that is only available for citizens of a Visa Waiver Program country who have valid passports from Visa Waiver Program countries.[2]

---

[1]     The Visa Waiver Program allows citizens of specific countries, such as France, to travel to the United States without having to obtain a Visa.  *See Visa Waiver Program*, U.S. DEP'T OF STATE (available at https://travel.state.gov/content/travel/en/us-visas/tourism-visit/visa-waiver-program.html [https://perma.cc/P4UE-26Z2]). Sri Lanka is not one of those specific countries.  Id.

[2]     *See Official ESTA Application*, U.S. CUSTOMS & BORDER PROTECTION (available at https://esta.cbp.dhs.gov/ [https://perma.cc/NT7N-DJ2U]).

The interviewing officer determined that Thankarasa was inadmissible under both 8 U.S.C. § 1182(a)(7)(A)(i)(I), as a noncitizen who did not possess a valid travel document, and 8 U.S.C. § 1182(a)(6)(C)(i), as a noncitizen who sought admission or other benefits through fraud or willful misrepresentation. Because Thankarasa had requested asylum, the Department of Homeland Security filed a Notice of Referral to an IJ.

II.   PROCEDURAL HISTORY

On May 9, 2023, with the assistance of counsel, Thankarasa filed applications for asylum, withholding of removal, and protection under the regulations implementing the Convention Against Torture with the IJ. At a hearing before the IJ, Thankarasa testified about the persecution that he had endured due to his political views in Sri Lanka. When asked what he thought would happen if he returned to Sri Lanka, Thankarasa said that he would continue to fear for his life because the police still had his personal information and might try to abuse him again based on his political beliefs.

On July 5, 2023, the IJ denied Thankarasa's motion for asylum in his discretion, finding Thankarasa's fraudulent use of the French passport to be an egregious factor that outweighed Thankarasa's reasonable fear of future political persecution. The IJ noted that Thankarasa "was twenty-four years old when he left Sri Lanka and possesse[d] a level of intelligence that [did] not mitigate his participation." App. 70. The IJ considered Thankarasa's conduct to be particularly egregious because it involved an immigration fraud that attempted to take advantage of the Visa Waiver Program, a

5

program only available to a select number of countries. After denying Thankarasa's asylum application, the IJ granted Thankarasa's application for withholding of removal.

Since asylum confers benefits that withholding of removal does not, the immigration regulations provide that, when a petitioner is denied asylum but granted withholding of removal, the denial of asylum "shall be reconsidered." 8 C.F.R. § 1208.16(e).[3] Upon reconsideration, the IJ in his discretion again denied Thankarasa's application for asylum. The IJ cited In re T-Z-, the only published BIA case discussing 8 C.F.R. § 1208.16(e), where the BIA emphasized the importance of probing "the impact of the denial on the respondent's ability to be reunited with his spouse and minor child." See 24 I. & N. Dec. 163, 176 (BIA 2007). The IJ found that this critical factor of reunification weighed against Thankarasa, however, as Thankarasa "does not have immediate family members … who would be eligible to

---

[3] On October 21, 2020, the Department of Justice and the Department of Homeland Security issued a final rule that eliminates 8 C.F.R. §§ 1208.16(e) and 208.16(e). See Procedures for Asylum and Bars to Asylum Eligibility, 85 Fed. Reg. 67202, 67257 (Oct. 21, 2020). Although this rule was scheduled to take effect on November 20, 2020, it was preliminarily enjoined. See Pangea Legal Servs., v. Dep't of Homeland Sec., 501 F. Supp. 3d. 792, 798 (N.D. Cal. 2020); Order on Defendants' Motions to Stay, Pangea Legal Services, No. 20-CV-07721-SI (N.D. Cal. Dec. 28, 2020). The order granting that preliminary injunction remains on appeal before the Ninth Circuit. See Pangea Legal Services, et al. v. Dep't of Homeland Sec., No. 20-17490 (9th Cir. filed Dec. 28, 2020).

6

immigrate to the United States as derivative asylees." App. 72.

On July 27, 2023, Thankarasa appealed the IJ's decision to the BIA. On November 15, 2023, the BIA affirmed and adopted the IJ's decision and dismissed Thankarasa's appeal. Specifically, the BIA considered that Thankarasa had falsely presented a French passport "to enter the United States pursuant to the Visa Waiver Program under an assumed identity," and found that the IJ had properly determined that Thankarasa's "fraudulent entry into the United States was egregious enough to outweigh a well-founded fear of future persecution in Sri Lanka." App. 36–37. Thankarasa then timely filed this petition.

III.    DISCUSSION[4]

Asylum is a form of relief that turns on evidence of "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1158(b)(1); 8 U.S.C. § 1101(a)(42)(A). Even where a petitioner meets these statutory requirements, "statutory eligibility for asylum does not give rise to a 'right to remain in the United States'" because a grant of asylum requires *both* determining statutory eligibility *and* deciding whether the applicant merits a favorable exercise of discretion. Sathanthrasa, 968 F.3d at 294 (quoting INS v. Cardoza-Fonseca, 480 U.S. 421, 443 (1987)); see Dankam v. Gonzales, 495 F.3d 113, 120 (4th Cir. 2007) (explaining that a grant of asylum involves two steps: (1)

---

[4]    The BIA had jurisdiction pursuant to 8 U.S.C. § 1103(g) and 8 C.F.R. 1003.1(b), and we have jurisdiction pursuant to 8 U.S.C. § 1252(a).

7

determining whether an alien qualifies under the statute, and if so, (2) exercising discretion favorably or unfavorably as to the alien's asylum application).

"In making the substantive determination of whether an alien qualifies for a discretionary grant of asylum, the immigration agency must examine the totality of the circumstances." Huang v. INS, 436 F.3d 89, 98 (2d Cir. 2006). Such an examination includes a "balancing of favorable and adverse factors."[5] Id. "The danger of persecution should

---

[5] As we explained in Sathanthrasa, positive factors include:
1) Family, business, community, and employment ties to the United States, and length of residence and property ownership in this country;
2) Evidence of hardship to the alien and his family if deported to any country, or if denied asylum such that the alien cannot be reunited with family members (as derivative asylees) in this country;
3) Evidence of good character, value, or service to the community, including proof of genuine rehabilitation if a criminal record is present;
4) General humanitarian reasons, such as age or health; [and]
5) Evidence of severe past persecution and/or well-founded fear of future persecution, including consideration of other relief granted or denied the applicant (e.g., withholding of removal or CAT protection).

generally outweigh all but the most egregious of adverse factors." Sathanthrasa, 968 F.3d at 295; Zuh, 547 F.3d at 507 (noting that the grounds upon which asylum can be discretionarily denied to an otherwise-eligible applicant are limited to cases of "egregious conduct by the applicant" such as fraud).

"In weighing these factors and making a discretionary asylum determination, an IJ need not expressly address every factor." Sathanthrasa, 968 F.3d at 295. Indeed, it need not "even list every factor." Zuh, 547 F.3d at 511. Like the Fourth Circuit, "we explicitly reject such an inflexible test and recognize the undesirability and difficulty, if not impossibility, of defining any standard in discretionary matters of this

---

968 F.3d at 294 (quoting Zuh v. Mukasey, 547 F.3d 504, 511 (4th Cir. 2008)) (brackets in original).

> Meanwhile, negative factors include:
> 1) Nature and underlying circumstances of the exclusion ground;
> 2) Presence of significant violations of immigration laws;
> 3) Presence of a criminal record and the nature, recency, and seriousness of that record, including evidence of recidivism;
> 4) Lack of candor with immigration officials, including an actual adverse credibility finding by the IJ; [and]
> 5) Other evidence that indicates bad character or undesirability for permanent residence in the United States.

Id. at 294–95 (quoting Zuh, 547 F.3d at 511) (brackets in original).

9

character.'" Id. (quotation omitted); see also Ojo v. Garland, 25 F.4th 152, 164 (2d Cir. 2022); Dehonzai v. Holder, 650 F.3d 1, 3 n.3 (1st Cir. 2011). The IJ must, however, "demonstrate that he or she reviewed the record and balanced the *relevant* factors and must discuss the positive or adverse factors that support his or her decision." Sathanthrasa, 968 F.3d at 295 (quoting Zuh, 547 F.3d at 511) (emphasis in original). These guidelines apply equally to the IJ's consideration of asylum in the first instance and the IJ's reconsideration of asylum under 8 C.F.R. § 1208.16(e). See Sathanthrasa, 968 F.3d at 295; Thamotar v. Att'y Gen., 1 F.4th 958, 973 (11th Cir. 2021).

Upon reconsideration, some factors are more relevant than others. Sathanthrasa, 968 F.3d at 295 (noting "points bear[ing] particular emphasis" during reconsideration). This is because one important difference between asylum and withholding of removal is that asylum permits "admission of the applicant's spouse or minor children," while withholding does not.[6]  8 C.F.R. § 1208.16(e). Thus, in addition to reweighing both the positive and negative factors initially assessed, the regulations require the IJ to consider the "reasons for the denial and reasonable alternatives available to the applicant such as reunification with his or her spouse or minor children in a third country." Id. Specifically, the IJ must consider evidence that "the alien cannot be reunited with family members (as derivative asylees)" if asylum is not granted, as well as the reasons for denial of asylum in the first

---

[6]    Asylum also provides a path to citizenship and eligibility for certain government benefits. Asylum Eligibility and Procedural Modifications, 84 Fed. Reg. 33,829, 33,832 (July 16, 2019).

10

instance.  Sathanthrasa, 968 F.3d at 295 (quoting Zuh, 547 F.3d at 511); In re T-Z-, 24 I. & N. Dec. at 176 ("Under 8 C.F.R. § 1208.16(e), when an alien is denied asylum solely in the exercise of discretion but is subsequently granted withholding of removal, the [IJ] must reconsider the denial of asylum to take into account factors relevant to family unification," and the IJ must "consider the impact of the denial on the respondent's ability to be reunited with his spouse and minor child.").

We review the IJ's decision "where the BIA has substantially relied on that opinion."  S.E.R.L. v. Att'y Gen., 894 F.3d 535, 543 (3d Cir. 2018) (quoting Camara v. Att'y Gen., 580 F.3d 196, 201 (3d Cir. 2009)).  When the BIA has adopted the IJ's decision and conducted its own analysis, "we review both the IJ's and the BIA's decisions."  Id.  (quoting Ordonez-Tevalan v. Att'y Gen., 837 F.3d 331, 341 (3d Cir. 2016)).  "We review a discretionary denial of asylum for abuse of discretion, and we will remand if the decision was arbitrary, irrational, or contrary to law."  Sathanthrasa, 968 F.3d at 292–93 (quotations and citations omitted).

With these principles in mind, we find that the IJ's discretionary denial of Thankarasa's asylum application both in the first instance, and upon reconsideration under § 1208.16(e), was not an abuse of discretion.

**A. The IJ Properly Considered the Egregiousness of Thankarasa's Immigration Fraud.**

Thankarasa challenges the IJ's determination (and the BIA's adoption thereof) that Thankarasa's fraudulent conduct

11

was an egregious factor, "outweigh[ing] [Thankarasa's] positive equity relative to his fear of future harm for purposes of the discretionary component of asylum." App. 70. This determination was not an abuse of discretion, however.

Upon initial consideration of Thankarasa's asylum application, the IJ applied the factors set forth by the BIA in Matter of Pula, 19 I. & N. Dec. 467, 474 (BIA 1987).[7] Specifically, the IJ found that the factors did not weigh in favor of Thankarasa who (1) passed through Romania, Belgium, France, and Portugal before coming to the United States; (2) did not allege that orderly refugee procedures were not available to help him in any of those countries;[8] (3) made no

---

[7] Matter of Pula listed seven factors to consider in this highly fact-specific inquiry including, (1) "whether the alien passed through any other countries or arrived in the United States directly from his country"; (2) "whether orderly refugee procedures were in fact available to help him in any country he passed through"; (3) "whether he made any attempts to seek asylum before coming to the United States"; (4) "the length of time the alien remained in a third country, and his living conditions, safety, and potential for long-term residency there"; (5) "whether the alien has relatives legally in the United States or other personal ties to this country which motivated him to seek asylum here rather than elsewhere"; (6) "general humanitarian considerations, such as an alien's tender age or poor health"; and (7) "if the alien engaged in fraud to circumvent orderly refugee procedures, the seriousness of the fraud should be considered." 19 I. & N. Dec. at 473–74.

[8] Compare Gulla v. Gonzales, 498 F.3d 911, 917 (9th Cir. 2007) (although asylum applicant had passed through Turkey,

12

attempt to seek asylum or immigration benefits from any of those countries;[9] (4) remained safely in those countries for more than two years; (5) has no relatives in the United States; (6) is a healthy adult male with no medical needs for which asylum would confer additional benefits; (7) has no children or spouse and thus no one eligible to receive derivative asylee benefits; and (8) engaged in serious fraud by using the passport and Visa Waiver Program ESTA of another person when entering the United States.[10]

---

Greece, and Mexico before arriving in the United States, "[h]is stays in Turkey and Mexico were brief," and "[t]he situation in Turkey was not safe for" members of the particular sect of Christianity to which the applicant belonged). Here, Thankarasa failed to make any argument as to why asylum or other immigration benefits would not be available to him in the European countries through which he passed.

[9]     During Thankarasa's June 28, 2023 hearing before the IJ, the Government asked Thankarasa if he applied for asylum or any immigration benefits in any of the countries he passed through before attempting to enter the United States, and Thankarasa said that he did not.

[10]     Thankarasa also argues that the IJ erred in determining that portions of Thankarasa's testimony were not credible and in purportedly allowing that credibility determination to inform his conclusion that Thankarasa's immigration fraud was egregious. We review adverse credibility determinations to ensure that they are not "based on speculation or conjecture, rather than on evidence in the record" and that they are supported by "specific, cogent reasons." Dia v. Ashcroft, 353 F.3d 228, 249 (3d Cir. 2003). Here, the IJ decided not to

13

In addition, the IJ determined that "the attempted circumvention of the immigration laws in this case is an egregious factor under Matter of Pula." His discussion of the significance of the Visa Waiver Program suggests that he viewed Thankarasa's assumption of a French citizen's identity while presenting a genuine French passport to enter the United States was closer to "the other extreme" of immigration fraud on Matter of Pula's spectrum of egregious conduct. Matter of Pula, 19 I. & N. at 474 (noting that "[t]he use of fraudulent documents to escape the country of persecution itself is not a significant adverse factor while, at the other extreme, entry under the assumed identity of a United States citizen with a United States passport, which was fraudulently obtained by the alien from the United States Government, is very serious fraud."); see also Matter of A-B-, 27 I. & N. Dec. 316, 345 n.12 (A.G. 2018) (explaining that the factors outlined in Matter of Pula are "[r]elevant discretionary factors" and "remind[ing] all asylum adjudicators that a favorable exercise of discretion is a

"credit [Thankarasa]'s purported lack of knowledge about documents he was provided, or had in his possession, during the two-year period that he was living in the European Bloc." App. 70. The IJ then listed four "specific, cogent reasons," why he believed Thankarasa's statements were not credible, and there was sufficient evidence in the record to support these reasons. See Dia, 353 F.3d at 249. Although Thankarasa argues that the egregiousness determination was erroneously focused on Thankarasa's use and knowledge of the Visa Waiver Program (knowledge he denies), the IJ made no findings regarding Thankarasa's specific knowledge of the Visa Waiver Program. On this record, we see no errors in the IJ's credibility determinations.

discrete requirement for the granting of asylum and should not be presumed or glossed over solely because an applicant otherwise meets the burden of proof for asylum eligibility under the INA").[11]

Finally, the IJ declined to exercise his discretion and grant Thankarasa asylum, after weighing the egregious adverse factor of Thankarasa's immigration fraud against Thankarasa's fear of future persecution in Sri Lanka. Upon reconsideration, the IJ reweighed both the positive and negative factors initially assessed, and considered the weight of Thankarasa's egregious conduct with a particular view to the critical factor of family reunification.

In circumstances like these, where the asylum applicant has demonstrated a well-founded fear of persecution, we have held that such a fear effectively precludes a discretionary denial of asylum unless the IJ can identify a sufficiently

---

[11] Thankarasa also identifies other instances of egregious conduct to argue that the fraudulent avoidance "of orderly refugee procedures" is not an egregious factor. Op. Br. 16 (quotation omitted); see id. at 17 (citing Marouf v. Lynch, 811 F.3d 174, 180 (6th Cir. 2016) (collecting cases)). The comparison fails, though, as several examples are analogous to Thankarasa's conduct. See Marouf, 811 F.3d at 180 ("Examples of reasons for discretionary denials upheld on appeal include . . . visa fraud . . . marriage fraud . . . convictions for counterfeiting . . . ."); Wu Zheng Huang v. INS, 436 F.3d 89, 98 (2d Cir. 2006) ("Adverse factors include criminal convictions, as well as significant violations of national immigration laws and the manner of entry into this country.").

15

"egregious adverse factor" to outweigh the credible threat of future harm. Sathanthrasa, 968 F.3d at 297. Here, the IJ considered the totality of Thankarasa's circumstances guided by the Matter of Pula factors and determined that Thankarasa's attempted fraudulent entry into the U.S. was an "egregious adverse factor." App. 70–71. While we have not required consideration of a specific set of factors in determining "egregiousness" under Sathanthrasa, we conclude that it was not an abuse of discretion for the IJ to employ the Matter of Pula factors in his analysis to discern the "totality of the circumstances" of Thankarasa's flight from Sri Lanka, see Matter of Pula, 19 I. & N. at 473, nor to conclude that Thankarasa's fraudulent attempted entry in to the United States was egregious in light of those circumstances.[12] We also

_____

[12] Indeed, several of our sister circuits have favorably viewed the IJ's consideration of the Matter of Pula factors. See, e.g., Thamotar, 1 F.4th at 970–974 (11th Cir. 2021) (citing 8 C.F.R. § 1003.1(g)(1),(2)) (holding that immigration judges should consider the factors outlined in Matter of Pula and noting that "these precedential agency decisions 'are binding … on immigration judges' and cabin the scope of their discretion to grant or deny asylum to an otherwise eligible applicant") ; Oloson v. INS, 51 F.3d 1045 (5th Cir. 1995) ("[T]he BIA cited Matter of Pula, considered [the applicant's] plight in light of the appropriate Pula factors [and] made relevant factual findings that are supported by the evidence … Accordingly, we cannot conclude that the BIA acted arbitrarily or capriciously or abused its discretion in denying [the applicant's] request for asylum"); Kouljinski v. Keisler, 505 F.3d 534, 542–43 (holding that an IJ did not abuse his discretion in denying the applicant's application for asylum where the IJ's opinion properly considered the Matter of Pula

16

perceive nothing arbitrary or capricious in the IJ's conclusion that Thankarasa was not entitled to a favorable exercise of discretion. The IJ set forth a thoroughly reasoned opinion in which he considered Thankarasa's immigration fraud in light of the totality of the circumstances, with a specific focus upon reconsideration of family reunification. We will therefore deny the petition as to this challenge.

> **B.** **The IJ Did Not Abuse His Discretion in Failing to Explicitly Address Thankarasa's Certificates of Character and Country Conditions Materials.**

Thankarasa also argues that the IJ abused his discretion in both initial consideration and reconsideration of Thankarasa's asylum application, by failing to address the certificates of good character and country condition materials submitted with his asylum application.[13] We perceive no abuse of discretion in the IJ's analysis.

As noted above, "an IJ need not *expressly* address every factor," and must only address "the *relevant* factors," noting how they support his or her decision. Sathanthrasa, 968 F.3d at 295 (first emphasis added) (quotation omitted). While the IJ

---

factors and did not run afoul of the BIA's guidance to consider "the totality of the circumstances").

[13] Thankarasa makes this argument as to the BIA as well. Op. Br. 12–13. As explained below, the IJ was not required to specifically address the certificates of good character and country condition materials submitted with Thankarasa's asylum application. For those same reasons, the BIA was also not required to explicitly address these materials.

did not explicitly address the country condition materials or certificates of good character in his initial asylum ruling, the IJ demonstrated that he "reviewed the record," balanced what he deemed to be "the *relevant* factors," and indicated how they supported his decision. Id. (quoting Zuh, 547 F.3d at 511). The IJ addressed each of the seven factors identified in Matter of Pula and explained how those factors supported his decision. The IJ assessed the positive factors identified in Sathanthrasa and found that, for the most part, they did not weigh in favor of granting asylum because, while (1) "[Thankarasa] was persecuted in the past on account of his actual or imputed political opinion," (2) "[Thankarasa]'s case d[id] not present humanitarian concerns as they relate to his age or health" or family ties, and (3) Thankarasa "d[id] not have employment history in the United States or ties to the United States community, property ownership, or any prior residence in the United States." App. 69, 71. Meanwhile, in assessing the Sathanthrasa factors adverse to a discretionary asylum decision, the IJ "afford[ed] a significant degree of weight to the nature of the underlying Immigration fraud in this case," and found that "the weight of the evidence indicates that the applicant knowingly participated and intended to defraud a U.S. immigration officer in order to enter the United States." App. 69–70. This review did not constitute an abuse of discretion as "there is no need to evaluate every factor enunciated by case law," see Ojo, 25 F.4th at 164. The IJ considered the entire record,[14] explicitly addressed how he weighed relevant considerations and why, and his analysis was

---

[14]     This includes the country condition materials, which the IJ explicitly addressed in his consideration of Thakarasa's application for withholding of removal.

18

not marred by any arbitrary or capricious reasoning. See Sathanthrasa, 968 F.3d at 295.

The IJ's review of these factors upon reconsideration was an equally permissible exercise of discretion. As noted above, the IJ cited the seminal BIA case on 8 C.F.R. § 1208.16(e) reconsideration, In re T-Z-, which like Sathanthrasa recognized the importance of family unification, and stated that he would "take into account factors relevant to issues of family unification." App. 71. The IJ accurately noted that Thankarasa has no immediate family members who would qualify as derivative asylees and, accordingly, concluded that this critical factor weighed against granting asylum. The IJ's reconsideration of his discretionary denial of asylum satisfied the requirements of 8 C.F.R. § 1206(e).[15] Recognizing the enormous caseloads faced by IJs, we do not perceive any abuse of discretion—whether upon initial review or reconsideration—when IJs do not expressly address every factor identified in caselaw when it is clear they have considered all the evidence presented to them, have conducted the analysis required by statute and precedent, and have provided sufficient explanation to review their decisions.

For the foregoing reasons, it was not an abuse of

---

[15] The BIA, in reviewing the IJ's analysis, stated, "[t]he applicant was 26 years old at the time of his hearing, single without children, and lacked ties to the United States," reaffirming the IJ's conclusion that reunification considerations cut against Thankarasa. App. 31– 32. The BIA concluded that the IJ "properly considered the relevant factors and did not err in finding the applicant did not meet his burden to establish his equities outweighed his visa fraud under the circumstances in this case." App. 37.

discretion for the IJ to not expressly consider country conditions or certificates of good character in his discretionary denial of asylum, or reconsideration thereof.

IV.     CONCLUSION

Because we perceive nothing arbitrary or capricious in the IJ's thoroughly reasoned conclusion that Thankarasa was not entitled to a favorable exercise of discretion upon initial review, and because the IJ reconsidered the discretionary denial of asylum in this case in the manner prescribed by § 1208.16(e) and our caselaw, the IJ did not abuse his discretion in denying Thankarasa's asylum application. Accordingly, we will deny Thankarasa's petition.

ROTH, <u>Circuit Judge</u>, dissenting.

Jathursan Thankarasa joined a political demonstration in support of Tamils in Sri Lanka. For this, the Sri Lankan government detained him, beat him, and burnt his stomach with cigarettes. Then, government supporters threatened to kill him, assaulted his family, and tried to abduct him from home under cover of night. So, with the help of a smuggler, he fled. Following the smuggler's instructions, he travelled first to Europe and then onward to the United States, where an Immigration Judge (IJ) found he would be persecuted if deported. Nevertheless, the IJ determined that Thankarasa's fraudulent use of a French passport was so egregious that he did not deserve U.S. protection. For that reason, the IJ denied his petition for asylum. The Board of Immigration Appeals (BIA) and the Majority agree. In so doing, the Majority misapplies our precedent, overlooks significant procedural errors by the BIA, and places us in conflict with the broad consensus of our sister circuits.

## I.     The BIA's Decision Was Procedurally Deficient.

In denying Thankarasa's petition for asylum, the BIA made three independent procedural errors—each of which justifies granting his petition and remanding for further proceedings. First, the BIA rested its decision, at least in part, on an abrogated standard. Second, the BIA failed to meaningfully address (and appears to have treated as irrelevant) Thankarasa's country-conditions evidence. Third, the BIA factored Thankarasa's withholding of removal into its denial of his asylum, despite our instructions that such factoring is impermissible.

1

**A. The BIA employed the wrong standard.**

We have had limited opportunity to address the issue of when discretionary denials of asylum constitute an abuse of discretion.[1] Nevertheless, our precedent imposes certain clear constraints on the BIA.[2] Foremost among these is the BIA's obligation to exercise its discretion consistently with its own precedent.[3]

As the parties recognize, the most significant precedent to this petition is *Matter of Pula*,[4] where the BIA departed from its previously held position in opinions like *Matter of Salim*[5] that entry fraud was "an extremely adverse factor" and an

---

[1] *See Sathanthrasa v. Att'y General*, 968 F.3d 285, 296 (3d Cir. 2020) ("Discretionary denials of asylum are exceedingly rare, and are even more rare when the IJ or BIA has found the applicant entitled to withholding of removal.").

[2] At oral argument, counsel for the government suggested that—even where a petitioner has shown the BIA abused its discretion—the petitioner must still make an independent showing that the government acted contrary to law in some fashion. This suggestion has been recognized as "legally untenable," *Ojo v. Garland*, 25 F.4th 152, 164 n.8 (2d Cir. 2022), and our caselaw expressly precludes it, *see Sathanthrasa*, 968 F.3d 285 at 292–93.

[3] *See Sathanthrasa*, 968 F.3d at 294 ("The BIA has established—and federal courts have enforced—extensive limitations on an IJ's exercise of discretion.") (cleaned up).

[4] 19 I. & N. Dec. 467 (BIA 1987).

[5] 18 I. & N. Dec. 311 (BIA 1982).

almost per-se bar to asylum.[6]  Retreating from this view, the BIA in *Pula* recognized that *Salim* had "placed too much emphasis on the circumvention of orderly refugee procedures." The BIA adopted instead a totality-of-the-circumstances test under which manner of entry was only one consideration among many and danger of persecution would "outweigh all but the most egregious adverse factors."[7]

Here, the BIA cited *Matter of Pula* and purported to apply it.  The BIA held, however, that Thankarasa's fraudulent entry was so egregious that it singlehandedly precluded an

---

[6] *Id.* at 315-16; *see also Matter of Gharadaghi*, 19 I. & N. Dec. 311, 314-15 (BIA 1985); *Matter of Shirdel*, 19 I. & N. Dec. 33, 38 (BIA 1984); *Matter of McMullin*, 19 I. & N. Dec. 90, 99 (BIA 1984); *cf. Matter of Rojas*, 15 I. & N. Dec. 492, 493 (BIA 1975).

[7] *Pula*, 19 I. & N. Dec. at 473; *see also Matter of D-X- & Y-Z-*, 25 I. & N. Dec. 664, 666 (BIA 2012) ("It is well settled that an alien is not faulted for using fraudulent documents to escape persecution and seek asylum in the United States."); *In re H-*, 21 I. & N. Dec. 337, 348 (BIA 1996) (reaffirming that "the danger of persecution should generally outweigh all but the most egregious of adverse factors.") (quotation omitted); *In re Kasinga*, 21 I. & N. Dec. 357, 367 (BIA 1996) (same); *Matter of Chen*, 20 I. & N. Dec. 16, 21 (BIA 1989) (concluding "the likelihood that the respondent intended to abandon his residence in China and remain in the United States permanently at the time he was admitted to this country as a nonimmigrant student" was not "controlling for the reasons set forth in Matter of Pula").

award of asylum.[8]  The BIA's sole authority that Thankarasa's fraud in fact qualified as an *egregious* adverse factor was its own pre-*Pula* precedent in *Matter of Shirdel*, which it cited as substantive authority that "entering the United States with the aid of professional smugglers after escaping the country of feared persecution is a strong negative factor supporting a discretionary denial of asylum."[9]  *Shirdel* expressly applied the *Salim* standard under which entry fraud almost definitionally precluded asylum.[10]  The BIA did not purport to hold that the petitioner's conduct was *more egregious* than that in *Salim*. Moreover, in the 37 years since *Salim* was abrogated the BIA has never, to my knowledge, relied upon *Shirdel*'s substantive analysis as support for a discretionary denial.[11]  Reliance on abrogated authority is, of course, reversible error, particularly

---

[8] While the BIA noted that Thankarasa was healthy and lacked a family-based need for asylum, our precedent makes clear that the presence of either of these factors would have been an additional positive equity, rather than their absence functioning as a negative one.  *See Sathanthrasa*, 968 F.3d at 294-95.

[9] C.A.R. 32 (citing *Shirdel*, 19 I. & N. Dec. at 38).

[10] *See Shirdel*, 19 I. & N. Dec. at 38 (noting the BIA "considered it a strong negative factor to enter the United States with the aid of a professional smuggler" and citing pre-*Pula* authority); *see also id*. (concluding that the IJ properly denied asylum in light of *Salim*).

[11] The BIA has at times cited *Shirdel* for the general proposition that asylum applicants bear the burden of proving asylum is warranted, *see, e.g.*, *Matter of H-*, 21 I. & N. Dec. 337, 347 (BIA 1996), or for its unrelated analysis of 8 U.S.C. § 1182, *see, e.g.*, *Matter of Y-G-*, 20 I. & N. Dec. 794, 797 (BIA 1994).

4

where that authority goes towards the central dispute on appeal.[12]

**B. The BIA failed to consider material favorable evidence.**

Let us assume though that the BIA did not rely upon *Shirdel* and undertook a properly guided review of Thankarasa's equities. As we recognized in *Sathanthrasa*,

---

[12] A brief word is in order regarding the Majority's contention that the IJ made an adverse credibility finding regarding Thankarasa. As an initial matter, the government denies that the IJ made any such finding. Moreover, the BIA expressly held that Thankarasa's entry fraud was enough, standing on its own, to justify denial, and to the extent we find this holding erroneous we are required to remand. *See Sathanthrasa*, 968 F.3d at 295. Nevertheless, the Majority's assertion that the IJ "listed four specific, cogent reasons" for disbelieving Thankarasa, Maj. Op. at 12 n.10, misstates both the record and Thankarasa's argument. At no point has Thankarasa contested that he was aware of the contents of the *French* passport he used to enter the United States. Indeed, he affirmatively admitted awareness in his asylum interview. What Thankarasa *has* argued is that the IJ erred in concluding he was aware of the contents of his *Sri Lankan* passport (which he never used to enter the United States). None of the listed reasons referred to by the Majority have any bearing on Thankarasa's awareness of *that* passport. It is moreover unclear what bearing Thankarasa's knowledge of his Sri Lankan passport has on his asylum eligibility.

5

such review would have required it to examine the "totality of the circumstances to determine whether" Thankarasa was "entitled to a discretionary grant of asylum."[13]

While neither an IJ nor the BIA is required to "expressly address every factor" relevant to a discretionary grant, they *are* required to "demonstrate that [they] reviewed the record and balanced the *relevant* factors."[14] And they must do so in a fashion that adequately shows that all evidence relevant to those factors has been "meaningfully considered."[15] Although the BIA is not required to "discuss every piece of evidence mentioned by an asylum applicant, it may not ignore evidence favorable" to the applicant, particularly where the "administrative brief expressly calls the BIA's attention to it."[16] Moreover, while a boilerplate statement that "all evidence and testimony has been considered, even if not specifically addressed" may suffice in some circumstances, it does not where the agency has chosen to discount evidence favorable to the petitioner.[17] Instead, "if evidence is to be disregarded, we need to know why."[18] We have specifically

---

[13] 968 F.3d at 294.

[14] *Id.* at 295 (emphasis in original) (noting that this "*explicit* requirement of balancing is consonant with the principle that we may affirm an agency's decision only on the grounds invoked by the agency" (emphasis added and quotation omitted)).

[15] *Fei Yan Zhu v. Att'y General*, 74 F.3d 268, 272 (3d Cir. 2014).

[16] *Huang v. Att'y General*, 620 F.3d 372, 387 (3d Cir. 2010).

[17] *Quinteros v. Att'y General*, 945 F.3d 772, 786 (3d Cir. 2019) (quotation omitted).

[18] *Id.* at 786.

emphasized that the "Board has a duty to *explicitly* consider any country conditions evidence submitted by an applicant that materially bears on his claim."[19]

Neither the IJ nor the BIA lived up to this mandate. While Thankarasa submitted extensive country-conditions evidence documenting the torture, systematic sexual violence, and death that frequently face Tamil activists in Sri Lanka, particularly those who have been deported after requesting asylum,[20] the IJ did not explicitly or implicitly refer to this evidence. He provided no indication beyond a boilerplate disclaimer that he had considered it at all.[21] Instead, he rested

---

[19] *Arckange Saint Ford v. Att'y General*, 51 F.4th 90, 98 (3d Cir. 2022) (quotation omitted and emphasis added).

[20] *See, e.g.*, C.A.R. 234-46 (State Department Human Rights Report documenting the arbitrary detention, torture, and killing by Sri Lankan government of ethnic minorities and dissenters); *id*. at 370–73 (Article documenting "culture of torture" directed at Sri Lankan detainees); *id*. at 379–82 (Article documenting abduction of foreign embassy employee by Sri Lankan government to obtain information about foreign asylum applicants); 383–91 (Articles documenting control of the Sri Lankan government by individuals with history of anti-Tamil human rights abuses); *id*. at 397–400 (Article titled "How Torture is Institutionalized in Sri Lanka"); *id.* at 401–02 (Article titled "Tamil asylum seekers deported from Australia raped and tortured"); *id*. at 403–07 (Article titled "British groom detained in Sri Lanka has been arrested and tortured, say family").

[21] Thankarasa separately challenges the IJ's failure to consider affidavits he submitted attesting to his good character. While I agree that the IJ's failure to do so constituted error, the BIA

his entire persecution analysis on Thankarasa's past experiences, and the regulatory presumption they created. [22] And although Thankarasa highlighted this omission in his brief to the BIA, its decision likewise contained no reference to Thankarasa's country-conditions evidence.

When questioned at oral argument, counsel for the Government argued that—having found that Thankarasa met the statutory definition of refugee—additional evidence towards that point was legally irrelevant, and that the IJ and BIA therefore had no need to consider it. This argument is both logically implausible and legally untenable. While a petitioner facing a 10% chance of being beaten and one facing a 99% chance of being slowly tortured to death may be equally eligible for asylum from a statutory perspective,[23] they are *not* equally situated when it comes to the exercise of discretion—

---

*did* adequately weigh this evidence. Although Thankarasa suggests the BIA should have remanded to the IJ to consider these affidavits in the first instance, he provides no argument for why such remand would have been warranted. I therefore concur with my colleagues that this omission is not a sufficient basis for remand.

[22] The Majority notes that the IJ *did* refer to Thankarasa's evidence that the rally at which he was arrested in fact took place. Maj. Op. at 16 n.14 (citing C.A.R. 71). That is a far cry from considering Thankarasa's evidence regarding the persecution he would likely face if returned.

[23] *See Doe v. Att'y General*, 956 F.3d 135, 151 (3d Cir. 2020) (citing *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 431 (1987)) (noting that a petitioner can establish eligibility for asylum based on a 10% risk of future persecution).

8

and a reasonable actor might well choose to grant asylum to the latter where they would not to the former.[24]

Here, Thankarasa's evidence of past persecution created a presumption that it was more likely than not that he would be persecuted if deported to Sri Lanka.[25] The distance between 51% and 100% is vast, and that presumption did not render his country-conditions evidence any less significant towards the exercise of discretion. Thankarasa's country-conditions evidence was directly probative of his risk of being detained, tortured, raped, and/or killed by government-sponsored actors if returned to Sri Lanka.[26] It therefore went directly to both the

---

[24] *See Sathanthrasa*, 968 F.3d at 295 (noting that a petitioner who has established a 51% chance of persecution is more in need of asylum than one who has simply established a well-founded fear); *Chen*, 20 I. & N. Dec. at 18 (noting that the "likelihood of present or future persecution" is "relevant as to the exercise of discretion" in asylum cases); *Kasinga*, 21 I. & N. Dec. at 367 (treating severity of feared persecution as relevant to the exercise of discretion).

[25] See 8 C.F.R. 208.13(b)(1).

[26] *See supra* n.20; *see also Jathursan v. Att'y General*, 17 F.4th 1365, 1371–75 (11th Cir. 2021) (granting petition where BIA failed to meaningfully consider similar evidence suggesting that Tamil failed asylum seekers "faced unthinkable sexual abuse and torture condoned by the highest levels of Sri Lankan governance" upon deportation (quotation omitted)); *Thayaparan v. Sessions*, 688 F. App'x 359, 366–71 (6th Cir. 2017) (granting petition where BIA failed to meaningfully consider similar evidence showing Tamil deportees, particularly those who had requested asylum, were likely to be detained tortured, raped and/or killed with impunity upon

severity and probability of persecution that he would face if deported, and as such to the discretionary equities regarding his application. The IJ and BIA's failure to consider it was error.

## C. The BIA improperly considered Thankarasa's withholding of removal.

Merely considering all proper factors is of course still not sufficient—the BIA must also avoid considering *improper* ones. Our decision in *Sathanthrasa* made clear that, while the government may look to a wide range of considerations before granting (or denying) asylum, it *may not* treat as relevant the fact that a petitioner "has been granted another form of relief, such as withholding."[27] Instead, the BIA is required to assume that the petitioner continues to face a well-founded fear of persecution if the petition is denied, and to adjudicate the asylum claim as if no other relief had been granted.[28]

---

return); *Gaksakuman v. Att'y General*, 767 F.3d 1164, 1170–71 (11th Cir. 2013) (same). Notably, each of these decisions was also part of the record submitted to the IJ.

[27] 968 F.3d at 295 (first citing *Zuh v. Mukasey*, 547 F.3d 504, 512 n.5 (4th Cir. 2008); then citing *Huang v. I.N.S.*, 436 F.3d 89, 98 n.11 (2d Cir. 2006)).

[28] See *id.* (noting that "[o]therwise, those very asylum-seekers who met the higher standard of proof for persecution required for withholding of removal (and thus those persons most in need of this nation's asylum relief) would be the ones who received less protection" (quotation omitted)).

Neither the IJ nor the BIA explicitly addressed whether Thankarasa's grant of withholding factored into their decisions, or whether asylum would have been granted had the possibility of deportation been more palpably proximate. However, when pressed at oral argument about how the BIA could justify sending a 24-year-old torture victim back to likely death because his human-trafficker instructed him to fake his nationality,[29] the government expressly argued that the BIA *had* taken his withholding into account, and that "in recognition of the fact that his life is in danger if he returns to Sri Lanka, he is not facing deportation." They further argued that "the government has protected [Thankarasa] and will continue to do so" through the grant of withholding, and suggested that because he will likely be permitted to stay in the United States for the foreseeable future, his past persecution was not legally significant. In other words, the government argued that we should credit it for making the exact calculation our precedent squarely prohibits. While the government's concern for Thankarasa's well-being is laudable, its admission that Thankarasa's denial was partially influenced by his grant of withholding means that denial cannot stand.

I would therefore remand for the BIA to address in the first instance whether Thankarasa's petition for asylum would have been granted had the correct standard been employed, the correct evidence been weighed, and the only alternative been deportation to Sri Lanka.

---

[29] Thankarasa testified to the BIA that the reason his smuggler pressed him to pass as quickly as possible through immigration was to ensure they could retain custody of him until his full debt had been paid off.

11

## II.     The BIA's Decision Was Substantively

## Aberrant.

My conclusion that the BIA failed to weigh all relevant factors (and chose to weigh irrelevant ones) means that, unlike the Majority, I do not need to decide if the conclusion it reached was substantively permissible.  Yet it is impossible to ignore that, by all accounts, the BIA's decision here was an outlier.   While our circuit has not previously explored the substantive contours of a "most egregious adverse factor," our sister circuits have—and have repeatedly concluded that, post-*Pula*, "manner of entry cannot, as a matter of law, suffice as a basis for a discretionary denial of asylum in the absence of other adverse factors."[30]   As such, they have held that using

---

[30] *Huang*, 436 F.3d at 99; *see also Shantu v. Lynch*, 654 F. App'x 608, 617 (4th Cir. 2017) (holding that manner of entry cannot be the sole basis for denying asylum); *Mamouzian v. Ashcroft*, 390 F.3d 1129, 1138 (9th Cir. 2004) (concluding that "the way in which [petitioner] entered this country is worth little if any weight in the balancing of positive and negative factors"); *Nreka v. U.S. Att'y Gen.*, 408 F.3d 1361, 1368 (11th Cir. 2005) (noting that "documents to facilitate travel or gain entry into the United States cannot in and of themselves be used as the basis to deny asylum"); *cf. Hussam v. Sessions*, 897 F.3d 707, 719 (6th Cir. 2018) (holding that the "failure to disclose that [a] passport was not obtained in the usual manner" could not "reasonably be termed the 'most egregious' of factors"); *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 772–73 (9th Cir. 2018) (collecting authority holding that discretionary denial of asylum cannot, as a matter of law, be based solely on manner of entry).

12

smugglers,[31] lying to immigration officials,[32] and utilizing fraudulent entry documents[33] cannot justify a discretionary denial when weighed against the threat of persecution. This

[31] *See*, *e.g.*, *Huang*, 436 F.3d at 99; *Mamouzian*, 390 F.3d at 1138; *Yuesu Weng v. U.S. Dep't of Just.*, 205 F. App'x 896, 899 (2d Cir. 2006) (concluding that "there is no authority to suggest that clandestine entry alone can be considered a serious adverse factor supporting discretionary denial of an asylum claim").

[32] *See*, *e.g.*, *Gunawan v. Mukasey*, 276 F. App'x 563, 564 (9th Cir. 2008) (reversing where the IJ "gave undue negative weight to petitioner's use of false statements as a means to gain entry into the United States"); *Jiang v. Att'y General*, 173 F. App'x 929, 931 (2d Cir. 2006) (reversing discretionary denial where petitioner "falsely represented herself as a citizen upon entry into the United States" since "evading normal refugee procedures is not sufficient to warrant discretionary denial"); *see also Shantu*, 654 F. App'x at 99 (cautioning the BIA on remand that lying to consular officials to obtain a visa likely did not qualify as a "most egregious" adverse factor).

[33] *See*, *e.g.*, *Hai Yu Lin v. Holder*, 334 F. App'x 859, 859 (9th Cir. 2009) (reversing where "IJ abused his discretion in denying asylum on discretionary grounds solely on the basis of [the petitioner's] use of a false passport to enter this country"); *Yang v. Gonzales*, 197 F. App'x 34, 37 (2d Cir. 2006) (holding that "the fact that [petitioner] used a fraudulent travel document to enter the United States, *by itself*," could not "support the IJ's denial of asylum" (emphasis in original)); *Khodaverdyan v. Ashcroft*, 111 F. App'x489, 491 (9th Cir. 2004) (reversing where the IJ "erred by giving dispositive weight to Khodaverdyan's attempt to enter the United States with a false passport").

13

includes fraudulent entry under the exact visa waiver provision that Thankarasa violated.[34]

The Majority does not address this body of precedent, and its focus on Thankarasa's pre-arrival time abroad does not negate it.[35] While these opinions do not often discuss the

---

[34] *See*, *e.g.*, *Nreka*, 408 F.3d at 1368 (finding use of fraudulent passport to obtain entry under the visa waiver program could not justify denying asylum). This consensus that entry fraud is not a "most egregious" aggravating factor is particularly stark when contrasted with other justifications for denial, such as repeated or violent criminal convictions, *see*, *e.g.*, *Kouljinski v. Keisler*, 505 F.3d 534, 542–43 (6th Cir. 2007)*; Jian v. I.N.S.*, 28 F.3d 256, 258 (2d Cir. 1994), and post-admission immigration fraud, *see*, *e.g.*, *Hosseini v. Gonzales*, 471 F.3d 953, 957 (9th Cir. 2006); *Htun v. Lynch*, 818 F.3d 1111, 1121 (10th Cir. 2010), which courts have generally affirmed. *See generally Matter of O-D-*, 21 I. & N. Dec. 1079, 1080 (BIA 1998) (distinguishing between using fraudulent documents to enter the United States and using them post-admission).

[35] The Majority *does* cite to language in some cases listing fraud as a potentially significant adverse factor. Even setting aside that neither of the Majority's cited authorities ultimately affirmed the BIA's decision, this authority cannot do the work the Majority requires of it (and in some instances directly supports Thankarasa).

The Majority relies on the Second Circuit Court of Appeals' statement in *Huang* that "significant violations of national immigration laws and the manner of entry into this country" can qualify as *an* adverse factor, Maj. Op. at 13 n.11 (citing *Huang*, 436 F.3d at 98), but overlooks that *Huang* then

14

petitioner's travel itinerary, it is clear in many instances the petitioner passed through other (safer) countries while in route to the United States, and that this did not alter their calculus that entry fraud is not a "most egregious" adverse factor.[36]

---

explicitly concluded that this could not, "as a matter of law," be the sole basis for denying asylum, 436 F.3d at 99–100.

The Majority then cites *Marouf v. Lynch*, which listed "visa fraud" as an instance where a discretionary denial had been previously upheld on appeal. Maj. Op. at 13 n.11 (citing 811 F.3d 174, 180 (6th Cir. 2016)). Even setting aside that *Marouf*'s discretionary analysis may not have commanded a majority, *see* 811 F.3d at 191 (McKeague, J., concurring in judgement); *id.* at 191 (White, J., concurring in judgement), this passage in *Marouf* was dictum—since the petitioner there had not engaged in any fraud whatsoever—and was cited only to highlight the non-egregiousness of the at-issue conduct. *See Marouf*, 811 F.3d at 18–-90.

Even *Aiqin Xue v. Holder*, the sole (non-precedential) visa–fraud case cited by *Marouf*, does not support the BIA. 538 F. App'x35 (2d Cir. 2013). In *Aiqin Xue*, the petitioner proceeded to provide materially false testimony during their asylum interview. *Id*. at 37; *see also supra* n.34. More importantly, the court in *Aiqin Xue* viewed the risk of persecution to the petitioner as negligible because they had been granted withholding of removal, 538 F. App'x at 37, an approach expressly barred by our precedent. *See supra* n.28. It is a very thin reed on which to rest departure from *East Bay*, *Gunawan*, *Hai Yu Lin*, *Huang*, *Jiang*, *Khodaverdyan*, *Mamouzian*, *Nreka*, *Shantu*, *Yang*, and *Yuesu Wang*.

[36] *See*, *e.g.*, *Huang*, 436 F.3d at 91 (Chinese refugee arrived in United States via Mexico); *Hussam*, 897 F.3d at 713 (Syrian refugee arrived in United States via Turkey).

15

Indeed, there is serious reason to doubt whether such transit is *ever* a legally permissible consideration.

It is true that in *Pula* the BIA treated third-country transit as relevant.[37] Subsequently, however, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, [38] and the BIA enacted a series of implementing regulations, which tightly govern the availability of asylum for applicants who have passed through potentially safe countries.[39] Those regulations initially permitted the BIA to consider such transit in its discretionary (as well as mandatory) analysis, but strictly cabined how that discretion could be exercised.[40] The BIA later eliminated the provision allowing for discretionary denials in its entirety, and its regulations currently only call for consideration of such transit where a petitioner has been "firmly resettled" in a safe third country.[41]

---

[37] 19 I. & N. Dec. at 473–74.

[38] *See* 8 U.S.C. § 1158(a)(2)(A), (b)(2)(A)(vi).

[39] *See generally E. Bay Sanctuary Covenant v. Barr*, 385 F.Supp.3d 922, 939–43 (N.D. Cal. 2019) (summarizing the relevant legislative and regulatory history).

[40] *See* 8 C.F.R. § 208.13(d) (1999) (repealed 2000) (providing that "[a]n asylum application may be denied in the discretion of the Attorney General if the alien can be removed to a third country which has offered resettlement and in which the alien would not face harm or persecution").

[41] *See generally* 8 C.F.R. § 208.15.

The Second[42] and Ninth[43] Circuit Courts of Appeals have both concluded that this statutory and regulatory framework (particularly when viewed in its historical context) was intended to partially supersede *Pula*'s discretionary analysis and fully determine when the BIA may deny asylum based on travel through a safe third country. The Fourth Circuit Court of Appeals has indicated it would hold the same way.[44] These courts have concluded that, as a matter of law,

---

[42] *See Tandia v. Gonzalez*, 437 F.3d 245, 248–49 (2d Cir. 2006) (holding that, post-2000, transit through a safe third country is "relevant only to a finding that [the petitioner had] 'firmly resettled'" and may not be used as a discretionary factor); *see also Lin Yan v. Att'y General*, 236 F. App'x 671, 676 (2d Cir. 2007).

[43] *See E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 982–83 (9th Cir. 2020) (noting that *Matter of Pula* has been superseded, and can no longer justify denial based on "failure to apply for asylum in a country through which the alien had passed"); *Mamouzian*, 390 F.3d at 1138 ("Stays in third countries are now governed by 8 C.F.R. § 208.15, which specifies how and when an opportunity to reside in a third country justifies a denial of asylum."); *Andriasian v. I.N.S*, 180 F.3d 1033, 1043–44 (9th Cir. 1999) ("*Matter of Pula* was the BIA's attempt to fill a gap left in INS regulations, a gap that has now been filled by the subsequent action of the INS." (cleaned up)); *see also Mikaleylen v. Mukasey*, 261 F. App'x 39, 43 (9th Cir. 2007) (holding that "unless an applicant has been 'firmly resettled' in a third country" an "IJ may not deny asylum on the grounds that an alien has spent time in another country before coming to the United States").

[44] In *Shantu v. Lynch*, the Fourth Circuit Court of Appeals suggested that the BIA consider adopting this position, but

17

the BIA may not, in exercising its discretion, consider the fact that a petitioner traveled through or stayed in a third country (even where they could have applied for asylum or otherwise sought safety).[45]  Indeed, the government appears to have acknowledged in other ongoing cases that the portions of *Pula* on which the Majority relies are no longer good law.[46]

given alternative grounds for remand did not need to decide the issue.  654 F. App'x 608, 617 (4th Cir. 2016).

[45] This is true even where that transit terminated in entry-fraud on the part of the petitioner. *See Mamouzian*, 390 F.3d at 1138.

[46] *See E. Bay*, 994 F.3d at 983 (noting that, on appeal, the government abandoned its argument that *Pula* justified discretionary denial based upon transit through a safe third country).  While it is perhaps arguable that the Attorney General's decision in *Matter of A-B-* revivified this portion of *Pula*'s holding, 27 I. & N. Dec. 316, 345 n.12 (Atty. Gen. 2018), that decision was subsequently vacated in its entirety and is no longer good law, 28 I. & N. Dec. 307, 309 (Atty. Gen. 2021).  Likewise, while BIA regulations enacted in 2020 would have provided for renewed consideration of third-party transit as a discretionary factor, *see* Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 Fed. Reg. 80274 (Dec. 11, 2020) (amending, *inter alia*, 8 C.F.R. § 208.13(d)), those regulations were later enjoined, *see Pangea Legal Servs. v. U.S. Dep't of Homeland Sec.*, 512 F. Supp. 3d 966, 977 (N.D. Cal. 2021), and that injunction remains in effect, *see Ullah v. Barr*, 72 F.4th 597, 603 n.3 (4th Cir. 2023).  Finally, while DHS enacted emergency regulations in May of 2023, which provide for limited consideration of such travel, those regulations are expressly limited to petitioners entering the United States via the southern border.  *See* Circumvention of Lawful Pathways,

One need not go as far as the Second and Ninth Circuit Courts of Appeals' categorical approach to conclude that entry fraud is not a "most egregious adverse factor." Moreover, the BIA's pervasive procedural errors make it unnecessary for me to determine whether those circuits have correctly analyzed the regulatory field.[47] The Majority, however, has no such license. As the government acknowledges that Thankarasa has not been firmly resettled, the Majority's dismissal of Thankarasa's petition necessarily places our Court in the minority without analysis.

## III.

The effect of today's opinion on Jathursan Thankarasa remain uncertain. He has been granted withholding, and it may be that the practical effects of denying him asylum prove limited. But the effects of today's decision on our immigration system are as certain as they are troubling. For this reason, I respectfully dissent.

---

88 Fed. Reg. 31314, 31315 n.2 (May 16, 2023) (amending 8 C.F.R.§ 208.33); Securing the Border, 89 Fed. Reg. 81156 (Oct 7, 2024) (extending rule applicability).

[47] It appears that the Seventh Circuit Court of Appeals has continued to treat *Pula*'s third-country-transit analysis as good law, albeit without analyzing or substantively addressing the relevant regulatory field. *See Alsagladi v. Gonzales*, 450 F.3d 700, 701–02 (7th Cir. 2006).